B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Flexible Funding Ltd. Liability Co. | DEFENDANTS<br>The Original Mowbray's Tree Service, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>SULLIVAN BLACKBURN PRATT LLP<br>601 Montgomery Street, Suite 1200<br>San Francisco, CA 94111<br>(415) 691-4518 | **ATTORNEYS** (If Known) |

**PARTY** (Check One Box Only)

| PARTY (Check One Box Only) | | PARTY (Check One Box Only) | |
|---|---|---|---|
| ☒ Debtor | ☐ U.S. Trustee/Bankruptcy Admin | ☐ Debtor | ☐ U.S. Trustee/Bankruptcy Admin |
| ☐ Creditor | ☐ Other | ☒ Creditor | ☐ Other |
| ☐ Trustee | | ☐ Trustee | |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Conspiracy to defraud, aiding and abetting fraud, fraudulent concealment/misrepresentation, negligent misrepresentation, breach of contract, objection to Mowbray's proof of claim.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☒ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 17,000,000.00 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Flexible Funding Ltd. Liability Co. | BANKRUPTCY CASE NO.<br>21-42215-11-mxm | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Fort Worth | NAME OF JUDGE<br>Mark X. Mullin |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Christopher D. Sullivan | |
|---|---|
| DATE<br><br>03/22/2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Christopher D. Sullivan |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

CHRISTOPHER D. SULLIVAN (CA State Bar No.148083)
(Admitted *Pro Hac Vice*)
ROXANNE BAHADURJI (CA State Bar No 290117)
(Admitted *Pro Hac Vice*)
**SULLIVAN BLACKBURN PRATT LLP**
601 Montgomery Street, Suite 1200
San Francisco, CA 94111
Phone: (415) 691-4518
Email: csullivan@sullivanblackburn.com
rbahadurji@sullivanblackburn.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| FLEXIBLE FUNDING LTD. LIABILITY CO., | ) ) ) | |
| Plaintiff | ) ) | Case No. 21-42215-11-mxm |
| | ) | Chapter 11 |
| v. | ) ) | Adversary Proceeding No. ___ |
| THE ORIGINAL MOWBRAY'S TREE SERVICE INCORPORATED, | ) ) ) | |
| | ) | **COMPLAINT** |
| Defendant | ) ) | |

Flexible Funding Ltd. Liability Co. ("Flexible"), cross-complaints against the

Original Mowbray's Tree Service Incorporated ("Mowbray's") as follows:

## STATEMENT OF JURISDICTION AND VENUE

1.      This adversary proceeding arises out of and relates to bankruptcy case

number 21-42215-11-mxm entitled *In re Flexible Funding Ltd. Liability Co.*, *et. al.*

commenced on September 19, 2021 ("Petition Date") in the United States Bankruptcy

Court for the Northern District of Texas, Fort Worth Division under Chapter 11 of the
Bankruptcy Code ("Bankruptcy Case").

2.      This adversary proceeding also arises out of and relates to Proof of
Claim No. 12 in the amount of $5,519,497.83 filed by Mowbray's in the Bankruptcy
Case on December 15, 2021. As alleged in the Proof of Claim, the basis of Mowbray's
claim is a Complaint filed by Mowbray's against Flexible in San Francisco Superior
Court. Through this adversary proceeding, Flexible brings crossclaims against
Mowbray's and objects to its Proof of Claim.

3.      This is an action brought under Fed. R. Bankr. P. 7001(a)(1) to recover
money or property of the estate as well as an action seeking disallowance of the Proof
of Claim filed by Mowbray's.

4.      The Court has jurisdiction over this adversary proceeding pursuant to
28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding under 28
U.S.C. § 157(b)(1), (b)(2)(A), (B), (C), and (O), and the Court can and should enter a
final judgment. To the extent that certain claims are determined to be non-core
matters, this Court has authority to hear and determine those non-core claims,
because the core aspects of this adversary proceeding are heavily predominant and
noncore aspects are related to these claims. Flexible consents to this Court's entry of
final orders or judgment on all the claims.

5.      This Court also has personal jurisdiction over Mowbray's. Mowbray's is
subject to nationwide service of process under Federal Rules of Bankruptcy Procedure
7004 and has a "constitutionally sufficient relationship" with the forum on account of

its organization and operation within the United States, as alleged below. *Double Eagle Energy Services, L.L.C. v. MarkWest Utica EMG, L.L.C*., 936 F.3d 260, 264 (5th Cir. 2019).

6.    Venue also properly lies in this judicial district, in that this civil proceeding arises under Title 11 of the United States Code as provided in 28 U.S.C. § 1409.

## **PARTIES**

7.    Flexible is a limited liability company organized and existing under the laws of California with a principal office in Texas.

8.    Flexible along with Instapay Flexible, LLC, are the Liquidating Debtors in the Bankruptcy Case, as set forth in the Amended Chapter 11 Joint Plan of Reorganization confirmed by the Court on July 13, 2022.

9.    Flexible is managed and administered by the Plan Administrator, Solution Advisors, LLC.

10.    Mowbray's is a corporation incorporated under the laws of California. Its principal place of business is in the County of Bernadino, California. Mowbray's primary business is vegetation management (tree removal) and is a licensed contractor with tree service and construction zone traffic control licenses issued under the laws of California. Mowbray's was a key contractor for Pacific Gas & Electric ("PGE") as part of PGE's efforts to mitigate forest fires in California.

3

## FACTS

### Flexible's Agreement with Mowbray's

11.     On or about March 20, 2019, Flexible entered into an Accounts Receivable Financing Agreement ("AR Financing Agreement") with Mowbray's. Pursuant to the AR Financing Agreement, Flexible provided Mowbray's with a credit line secured by Mowbray's accounts receivable ("Accounts Receivable") from services and sales provided by Mowbray's to Southern California Edison ("SCE") and PGE (collectively "Eligible Account Debtors"). Per the AR Financing Agreement, Mowbray's was to notify the Eligible Account Debtors to send payment directly to Flexible. (AR Financing Agreement, ¶¶ 5-6). If payment was made to Mowbray, it was to be held in trust for Flexible. (AR Financing Agreement, ¶ 6.1).

12.     The AR Financing Agreement required Mowbray's to provide Flexible on a weekly basis an "Invoice Pack" consisting of the details of all outstanding Accounts Receivable, supporting information for all Accounts Receivable, and a listing of unpaid Accounts Receivable. (AR Financing Agreement, ¶ 2). With respect to the goods and services provided to the Eligible Account Debtors described within each Invoice Pack, Mowbray's warranted and guaranteed that if provided directly by Mowbray's to such Eligible Account Debtor, such goods and services were in fact provided or rendered on the dates and in the amounts described in the Invoice Pack. (AR Financing Agreement, ¶ 3.1.1). Additionally, with respect to the services and goods provided by any subcontractor, agent or independent contractor of Mowbray's, Mowbray's warranted and guaranteed that it "will make all reasonable efforts to

4

ensure that such goods and services were in fact provided or rendered on the date(s) and in the amount(s) described in the *Invoice Pack*." (AR Financing Agreement, ¶ 3.1.2 [emphasis in original]).

13. With respect to each Accounts Receivable that Mowbray's was submitting for funding to "the extent relating to goods or services provided by any subcontractor, agent or independent contractor of MOWBRAY, MOWBRAY will make all reasonable efforts to ensure that such *Accounts Receivable* (or portion thereof) is then and will continue to be genuine, bona fide and collectable and not subject to dispute, right of offset, counterclaim or right of return or cancellation." (AR Financing Agreement, ¶ 3.2.2 [emphasis in original]). Furthermore, Mowbray's was to make "all reasonable efforts to ensure" that the "facts, figures and representations" relating to "goods and services provided by any subcontractor" were "true and correct." (AR Financing Agreement, ¶ 21.3.2). Moreover, the AR Financing Agreement provided that "[n]o information furnished by or on behalf of MOWBRAY (including but not limited to facts, figures, and representations given) shall knowingly and willfully contain untrue statements of material fact or omit material facts." (AR Financing Agreement, ¶ 21.8).

14. Mowbray's was to immediately notify Flexible in writing if Mowbray's was notified by any Eligible Account Debtor of any "disputes, or of any right of offset, counterclaim or right of return or cancellation against such *Eligible Account Debtor's* obligation to pay any *Accounts Receivable*, or portion thereof, to MOWBRAY." (AR Financing Agreement, ¶ 3.4 [emphasis in original]).

5

15.    The AR Financing Agreement was subsequently amended on June 28, 2019, February 19, 2020, and March 6, 2020. A copy of the AR Financing Agreement along with the amendments is attached to this Complaint as Exhibit "A".

**Flexible's Agreement with Graham County Land Company**

16.    Graham County Land Company, L.L.C. ("GCLC") is a limited liability company organized and existing under the laws of the State of North Carolina with a principal place of business in Graham County, North Carolina.

17.    GCLC was a debris removal company based in Robbinsville, Graham County, North Carolina that contracted with private companies and state agencies like the North Carolina, South Carolina, and Georgia Departments of Transportation to provide land clearing and tree and debris removal.

18.    Randy Jordan was a resident of Graham County.  He was a managing member and was the principal of GCLC.  Randy Jordan ran GCLC before it was put into receivership as described below. He is since deceased.

19.    From 2014 until they ceased operations, GCLC relied on accounts receivable financing, i.e., factoring, to fund its operations.

20.    Flexible began to provide accounts receivable financing to GCLC in July 2019 – approximately four months after Mowbray and Flexible entered into the AR Financing Agreement.

21.    On August 8, 2019, GCLC executed and delivered to Plaintiff an Amended and Restated Accounts Receivable Purchase Agreement, with an effective date of July 22, 2019 ("GCLC Factoring Agreement").  Flexible received assignments

of GCLC's factoring relationship from its previous factor.

22.    A copy of the GCLC Factoring Agreement is attached as "Exhibit B" and incorporated by reference.

23.    The GCLC Factoring Agreement created a factoring facility ("Factoring Facility") by which GCLC could sell and Flexible could purchase certain present and future accounts receivable resulting from services and sales provided by GCLC to GCLC's customers ("Account Debtors").

24.    Under the Factoring Agreement, GCLC was only supposed to offer for sale to Flexible "Eligible Receivables," as defined in the Factoring Agreement, arising out of the sale of goods or services rendered. A receivable was not an "Eligible Receivable" if it was disputed, subject to any counterclaim, defense, or right of setoff. Invoices purchased by Flexible were defined as "Purchased Receivables" under the Factoring Agreement.

25.    The Factoring Agreement established a bookkeeping account known as a "Reserve Account" to account for the purchases of Eligible Receivables by Flexible ("Advances"), obligations owed by GCLC to Flexible, and credits for collections of Purchased Receivables by Flexible.

26.    The original maximum Advance limit under the Factoring Facility was $8,000,000.00.

27.    On January 17, 2020, GCLC and Flexible amended the terms of the Factoring Agreement to, among other things, increase the maximum Advance limit under the Factoring Facility to $12,000,000.00.

28.    On September 22, 2020, GCLC executed and delivered to Flexible a Third Amendment to the Amended and Restated Accounts Receivable Purchase Agreement to decrease the maximum Advance limit under the Factoring Facility to $8,000,000.00.

**Flexible, Mowbray, and GCLCs' Business Relationship**

29.    Prior to Flexible's factoring relationships with Mowbray's and GCLC, in or about September 2018, California based Mowbray's curiously entered into an agreement with North Carolina based GCLC for GCLC to work as Mowbray's subcontractor on certain PGE projects in California. At the time that GCLC and Mowbray entered into this arrangement, Randy Jordan's brother Ronnie Jordan was Mowbray's CEO. On August 31, 2018, a Mowbray's employee contacted a GCLC Executive and VP of Finance stating that "Ronnie Jordan asked me to contact you" to obtain GCLC's information for PGE's approval of GCLC to work as a subcontractor for Mowbray's.  On September 4, 2018, Ronnie forwarded the information provided by GCLC to PGE and wrote "[p]lease expedite this sub approval request."

30.    After Flexible started to fund GCLC in July 2019, Flexible became both Mowbray's and GCLC's accounts receivable financer. Because GCLC was a subcontractor for Mowbray's, Mowbray was an "Account Debtor" under the terms of the GCLC Factoring Agreement required to make payment on GCLC's invoices directly to Flexible.

31.    Furthermore, pursuant to the Factoring Facility, in addition to GCLC sending its invoices to Mowbray's for services it performed as a subcontractor to

Mowbray, it was required to submit those same invoices to GCLC as part of the Invoice Pack. Subject to the terms of the Factoring Agreement and upon receipt of an offer for sale of Eligible Receivables from GCLC and the Invoice Pack, Flexible would remit the "Initial Purchase Payment" which was 85% of amount of the Invoice Pack to GCLC.

32. With respect to Mowbray's billing procedure when a subcontractor is involved, like GCLC, Alan Phang ("Mr. Phang"), Mowbray's controller in September 2020 explained:

> Sub-Contractor – they will send us invoice for their work, we turn around and bill PG&E/SCE for their work @ 15-20% profit, once our billing team confirmed their invoice is correct and billed, then we will pay the Sub invoice[.] […]
>
> Some Sub-Contractor also rent equipment from us, we will also charge back from their invoice.
>
> We do not bill Sub-Contractor, they bill us for their work, we only deduct charge back from their invoice and pay them the balance.

33. Flexible entered into this process as GCLC's accounts receivable financer, meaning that GCLC was required to submit its invoices to Mowbray's for payment and to Flexible for financing. Mowbray's took GCLC's invoice added on 15-20%, and invoiced PGE for the increased amount. Then, Mowbray's deducted any chargebacks, monthly equipment rentals, and wire transfer fees, and paid Flexible on that reduced amount.

## GCLC's Fraudulent Invoices

35. Mowbray's quickly learned that the invoices that GCLC submitted

contained misleading information, critical billing errors, and misrepresentations.

36.     For instance, on July 25, 2019, Adriana Gamboa, the PGE Billing Clerk at that time, e-mailed Quinn Carver of GCLC identifying multiple issues with invoices submitted, including: wrongful billing of crews at a higher rate; double charging of per-diem payments; double billing of crews; double counting of workers; and tampering of hours. Based on her email, GCLC's wrongful conduct seemed to be a pattern.  Ms. Gamboa specifically complained:

> [T]he payment received today actually had all of those T and C rates converted over to Lift rates in order to provide a higher payment which is something that we should NOT be doing at all and is jeopardizing this work.
>
> Also, please be aware that per-diem is being double-charged on some of the work.
>
> Some of them were tracked on both the POL timesheets and the Work Request timesheets, resulting in double-charges for the same day.
>
>  [...]
>
> Not only that, but we also discussed over the phone that Mario Cortez has been listed twice and I mentioned that the invoice was going to change for sure.
>
>  [...]
>
> The hours have been tampered with over and over again.
>
>  [...]
>
> Every time I have received a new scan, the work shows different crews and different hours worked.

37.     These issues were not corrected by GCLC and one-year later in June 2020 were the subject of emails and discussions between PGE's Vegetation Program

10

Manager, Randy Jordan of GCLC, and Mowbray's, including Ronnie Jordan. PGE highlighted that GCLC was charging for overtime when it should not have been and was billing for management positions that were non-billable. PGE's Vegetation Program Manager stated that only "[i]f revisions have been made……then I am ready to review them […] Please help me review and correct these invoices so we can get them moved through."

38.     In August 2020, Ms. Gamboa again complained of GCL's billing practice. She emailed Mr. Phang on August 17, 2020 stating that a particular GCLC invoice was not payable because "GCL got sent back to clean up for trees that they had already worked for. GCLC is not supposed to charge again for this work. They already received payment for this work and these units did not meet the proper clearance. Please do not pay this invoice."

39.     GCLC's wrongful billing practices were caught by PGE and dealt with through chargebacks. For instance, on August 17, 2020, Mr. Phang instructed certain individuals at Mowbray's not to pay GCL's invoices because "Adriana [Ms. Gamboa] have a lot of charge back[.]" To which Ms. Gamboa responded that on three GCLC invoices there was a total charge back of $169,329.73 (with a $69,817.43 deduction on one invoice, $55,110.20 on another, and $44,402.10 deduction on the third invoice).

40.     On August 26, 2020, Adriana forwarded Mr. Phang "GCLC's charge-back spreadsheet" for the period of January 1, 2020 to August 2020 showing the chargebacks for that period to be in the amount of $283,739.61. She explained that "[s]ome were issues with miscounts, double-bills, or over-bills. Employees are being

charged twice across different time-sheets for the same day and same week ending."
Mr. Phang replies: "This is in addition to the previous $127K for the Charge back on
PI Admin – Another $283K[.]"

41.     These deductions strike at the heart of Flexible's financing operations.
Flexible financed and purchased invoices at a pre-deduction value and in return only
received a much smaller payment after deductions, set offs, and chargebacks.
Therefore, there was no way for Flexible to be able to fully recover the money it had
given for purchased receivables.

## Mowbray's Executive Team Knew About GCLC's Fraudulent Billings, and Actively Concealed and Misrepresented the Facts From Flexible

42.     Mowbray's knew from communications and notices from both Flexible
and GCLC that GCLC had entered into the Factoring Facility with Flexible.

43.     Having entered into its own facility with Flexible approximately four
months earlier, Mowbray's also knew Flexible's invoice verification procedures.
Mowbray's knew that GCLC sent invoices to Mowbray's for payment and for Flexible
for financing.

44.     Mowbray's also knew that GCLC's invoices contained misleading
information and misrepresentations and thus, following Mowbray's receipt of an
invoice from GCLC, there would be chargebacks (as explained above) in addition to
monthly equipment rentals. Being a North Carolina company performing vegetation
management services in California, GCLC did not have the equipment needed and
rented the equipment from Mowbray.

45.     Mowbray's knew that the invoices that Flexible was receiving from

GCLC were in essence "gross" invoices because they offered no hint of any upcoming deductions. Flexible was financing the invoices at pre-deduction and receiving a much smaller payment from Mowbray's after it had made the deductions.

46.    Mowbray's knew that Flexible, like any other accounts receivable financing firm, was not aware of the deductions that Mowbray's was applying after Flexible received invoices from GCLC. Pursuant to the AR Financing Agreement, Mowbray's was required to disclose these deductions and to ensure that the Accounts Receivable that Mowbray's was submitting to Flexible for funding relating to GCLC's services were collectible and not subject to offset or dispute. (AR Financing Agreement, ¶¶ 3.2.2, 21.3.2).

47.    Nevertheless, Mowbray's acted in concert with GCLC to keep Flexible in the dark on the chargebacks being applied to GCLC's invoices after invoices were sent to Flexible and after Flexible had purchased in essence ineligible accounts receivable. For instance, on March 20, 2020, Mowbray's Ruth Rios sent an email to Flexible copying Randy Jordan and other GCLC executives showing a wire transfer on account of a GCLC invoice in the amount of $126,138.76. The Flexible representative responded: "this invoice is for $155,740, why the short pay?" That same day, Randy Jordan forwarded the email exchange to his brother Ronnie Jordan with the instructions: "I don't need Ruth sending these to Flexible[.]"

48.    Mowbray's active efforts to conceal the facts from and assist GCLC in its fraud continued in May 2020. On May 19, 2020, Karina Gonzalez of Flexible emailed Mowbray's a list of GCLC invoices from April through May 2020 with the invoice

13

amount and requested confirmation that Mowbray's received those invoices and their payment status. Upon receipt of what should have been a routine email requiring an answer in the ordinary course, Mr. Phang swiftly forwarded the email to Ronnie Jordan stating "Flexible is asking us to confirm GCL invoices below, some of the invoices have different amount – do you want us to reply Flexible or do you want GCL to take care of this[.]" He explained, "invoice #602002201 $169,481.60 – we only paid them $40,704.00[.]" Ronnie replied "I'm asking GCL about it."

49.    Mr. Phang alerted Ronnie Jordan of Flexible's questions because Mr. Phang and other personnel at Mowbray's had been warned by Ronnie Jordan as Mowbray's CEO to not send information relating to chargebacks, discrepancies between the invoices submitted to Flexible versus Mowbray's, and the amounts actually paid on those invoices. Rather than disclosing its knowledge that Mowbray's was submitting ineligible invoices for funding, knowing fully well of the damages to Flexible from purchasing invoices of lesser value to no value, Mowbray's concealed the facts, deferred to GCLC, followed GCLC's lead, and made material misrepresentations to Flexible.

50.    For instance, on June 2, 2020, Tammy Rouah (Flexible's VP and Senior Funding Officer) emailed Mr. Phang seeking to understand the discrepancy between the amount that GCLC showed as Mowbray owed to it versus the amount that Mowbray showed it owed to GCLC. Specifically, she stated: "Mowbray shows the open amount for Graham on the AP is a credit balance of $39,813, yet Graham shows the open amount on their A/R aging for Mowbray's is $3,894mm. Could you please shed

some light on this?" Following what appeared to be the process of checking first with GCLC and deferring to it, Mr. Phang forwarded the email to Ronnie Jordan and asked him to send Flexible's email to GCLC. Mr. Phang continued that he would respond to Flexible asking them to reconcile with GCLC directly, unless Ronnie Jordan wanted Mr. Phang to reply differently. Then, Ronnie Jordan promptly forwarded Flexible's email to Randy Jordan and Randy Jordan replied emphatically– "tell him [Mr. Phang] not to reply" to Flexible. Mowbray's was acting in concert with GCLC to keep Flexible in the dark as to GCLC's fraud.

51.     On June 3, 2020, Karina Gonzalez followed up with Mowbray on her May 19, 2020 email. This time the invoice confirmation request included the invoices that she had previously inquired about on May 19, 2020, and additional invoices that had since been generated. Another Flexible representative followed up with Mowbray's explaining the importance of the information requested, "please understand we have to get verification from Mowbray's for our auditors." Mr. Phang responded to Flexible stating "I am still working with Ronnie about GCL, will advise shortly." Mr. Phang then privately emailed Ronnie Jordan on June 3, 2020, stating "Flexible ask again on status with GCL – let me know how to reply…"

52.     Mr. Phang emailed Ronnie Jordan again on June 3, 2020. In this email he compares the invoice amount provided by Flexible with respect to the 24 GCLC invoices from April through May 2020 that Flexible was requesting information for against the amounts Mowbray's actually paid for each invoice. While the invoices provided to Flexible listed the total amount owed as $1,649,557.79, the amount that

Mowbray's paid for these invoices was $1,009,235 – approximately 40% less than the amount Flexible was expecting to receive on the invoices that it had purchased.

53.    Mr. Phang understood the gravity of the information he was sending to Ronnie Jordan because he states in another email from June 3, 2020: "Please let me know how to reply to Flexible. *If I send them this, I don't know what they will do to GCL*[.]" [Emphasis added].

54.    Mr. Phang was clearly worried about the consequences to GCLC from Flexible finding out that the Accounts Receivable that Flexible was purchasing from GCLC were grossly inflated compared to the invoices being sent to Mowbray's.  To make matters worse, Mowbray's also knew that the actual payments on account of those invoices were far lower than the invoiced amount due to deductions and chargebacks.

55.    Rather than disclose the truth to Flexible, Mr. Phang crafts a brush-off explanation and a standardized reply that he requests Ronnie Jordan to approve. Alan states: "I can reply flexible saying that all the invoices has been paid with different amount due to deduction from Equipment Rental and other adjustment, please reconcile with GCL. Please let me know this is their 3rd request." Ronnie Jordan quickly forwards Mr. Phang's email to Randy Jordan.

56.    Subsequently, Ronnie Jordan, Randy Jordan, and Mr. Phang discuss how to respond to Flexible's inquiries and come up with cover-up explanations. On June 4, 2020, Mr. Phang replies to Ms. Rouah's June 2 email, stating "I just spoke with Ronnie and Randy. Randy will call Tammy to reconcile their account with

Flexible[.]" Mr. Phang also adopts his earlier suggested brush off explanation when he states: "we submit the payment to GCL, we deducted a lot of Equipment Rental, Expense reimbursement and other deductions, that's why GCL need to reconcile their account with Flexible, we have no idea what is pending from PG&E." Alan's deception continues when he states "there were a lot of invoices that GCL are waiting approval from PG&E to invoice Mowbrays but they sent the invoices to Flexible." Mowbray's staff coordinated with GCLC to develop a deceptive response to Flexible.

57.     Mowbray's knew that the invoices that GCLC was submitting to Flexible were highly inflated, fraudulent, and ineligible accounts receivable. To illustrate, on June 4, 2020, the very same day as his misrepresentations to Ms. Rouah above, Mr. Phang emails Robin and Ricky Mowbray saying "GCL is so messed up, Adriana [Mowbray's PG&E billing clerk] told me that Quinn [of GCLC] *also duplicate their invoice* so they can get more money from us! I will stop payment them until all invoices has been reconcile." [emphasis added]. Mr. Phang clearly knew and was telegraphing to Mowbray's ownership that GCLC was submitting fraudulent invoices to Flexible and that internally Mowbray's was conducting a reconciliation to ensure that the invoices that it received from GCLC were not duplicative or fraudulent either. Mowbray's knew that Mr. Phang's partial explanations and representations to Flexible on why the amounts paid by Mowbray to GCLC were so disparate from the amounts that GCLC was reporting to Flexible were false.

58.     Mowbray's, however, continued to conceal the facts from Flexible and make material misrepresentations. On August 26, 2020, Karina Gonzalez of Flexible

emailed Mr. Phang providing him with a statement of account and asking him if Mowbray's had "all of the invoices in the attached statement of account [and] please advise if the invoices are still being reconciled by GCL as well." The statement of account showed $3,884,764.95 as owed to GCLC. This email was marked by Ms. Gonzalez as highly important. Mr. Phang forwards this email to Mowbray's ownership – Ricky and Robin Mowbray – and states clearly: "Flexible asks us to confirm this statement of account from GCL -total $3,884,764.95, that means *GCL is making th[ese]* [invoices] *up to borrow money.*" [Emphasis added]. Mowbray's admits to knowing of GCLC's fraud.

59.    Nevertheless, Mr. Phang casually responds to Ms. Gonzalez attaching the "latest GCL Aging they [GCLC] send me this morning, I am not aware of any other outstanding invoices in your statement from GCL." "We paid up to date on all GCL invoices except the attach list, which we have not process or confirm from PG&E to pay GCL yet." The difference between Mr. Phang's comments to Ricky and Ronnie Mowbray and his words to Ms. Gonzalez is starkly apparent. He reports the truth to Mowbray's and conceals the facts from Flexible, thus knowingly deceiving Flexible.

60.    Mowbray's did not report the full story to Flexible because around the time that Flexible was asking for further information from Mowbray's (March – August 2020), Mowbray's knew that GCLC was having cash flow problems and had cash flow problems for some time. In an email from August 12, 2020, from Mr. Phang to Robin Mowbray and a number of other Mowbray's representatives, Mr. Phang admits that "Ronnie ask me to help GCL on their cash flow as they are having

18

difficulty this week, so Ronnie approved the payment based on their aging." Mowbray's also made several advance payments in March through April 2020 to GCLC totaling $1.3 million without approved invoices.

61.     Mowbray's knew that GCLC was submitting fraudulent, inflated, and illegible invoices with little to no value to Flexible for purchase so that GCLC could receive funding from Flexible. Mowbray's also knew that Flexible was not aware of GCLC's fraudulent conduct, and that Flexible was conducting due diligence and looking to receive truthful and complete information to try to understand the discrepancy between the invoices that it was receiving and purchasing from GCLC with the amounts that Mowbray's was paying on account of GCLC's invoices. While Mowbray's was convinced of GCLC's fraud, it concealed the facts from Flexible, provided partial and incomplete information to Flexible, and worked in concert with GCLC –deferring to Randy Jordan on how to respond to Flexible.

62.     Ultimately, GLC ran out of money. On August 10, 2021, Flexible notified GCLC of several events of default, reserved its rights under the Factoring Documents, and among other things notified GCLC that no advances would be made under the Factoring Facility. When Flexible discovered GCLC's fraud and later Mowbray's substantial assistance to GCLC, it could not recover its loss.

63.     Flexible filed a Verified Complaint in Graham County Superior Court, File Number 21-CVS-142, seeking, among other relief, a money judgment against GCLC, a money judgment against Randy Jordan, and the appointment of a general receiver to take possession of, manage, and control GCLC.  The Complaint alleges

that GCLC and Jordan owe Flexible over $17,000,000.

64.    On October 13, 2021, on Flexible's request, a receiver was appointed over GCLC.  Going into the receivership, Flexible had purchased receivables on its books of approximately $12,000,000. This amount was based, in part, on GCLC's conduct in submitting fraudulent invoices to Flexible and Mowbray's substantial assistance in the fraud. Flexible and the receiver determined that the actual value of the purchased receivables from GCLC is only a fraction of the amount sold to Flexible and the amount Flexible paid to GCLC based on GCLC and Mowbray's misrepresentations and omissions.  In the 28 months of the receivership, Flexible received approximately $4,250,000 through the liquidation of assets, collection of legitimate invoices, and settlement of claims. The size of Flexible's loss under the Factoring Facility with GCLC rendered it insolvent, and it had to file for Chapter 11 bankruptcy protection in this Court.

## FIRST CLAIM FOR RELIEF
### (Conspiracy to Defraud)

65.    The previous allegations are re-alleged and incorporated by reference as if completely set forth.

66.    Through the described conduct Mowbray's conspired with GCLC to defraud Flexible.

67.    Mowbray's knew that GCLC was submitting fraudulent, misleading, and inflated invoices with little to no value to Flexible for purchase so that GCLC could receive funding from Flexible. Mowbray's also knew that the invoices that it was receiving from GCLC were subject to substantial setoffs and chargebacks, the

20

specifics of which Flexible was unaware of. Moreover, Mowbray's knew that Flexible was financing and purchasing GCLC's invoices with Mowbray's prior to these deductions.

68.     Nevertheless, instead of disclosing its substantial knowledge of GCLC's fraud when Flexible directed specific due diligence inquiries to Mowbray's, Mowbray's acted in concert with GCLC by among other actions, coordinating with Randy Jordan and GCLC prior to providing information to Flexible, following Randy Jordan's orders with respect to withholding and suppressing information from Flexible, working with GCLC and Randy Jordan to craft cover-up explanations and deceptive responses to Flexible, and concealing material facts from Flexible. The above-described conduct, omissions, and misrepresentations were reasonably calculated and made with the intent to deceive.

69.     At the time of the above-described misrepresentations, omissions, and conduct, Mowbray and GCLC had a close relationship -- indeed it was a family relationship. Mowbray's CEO was Ronnie Jordan, the brother of GCLC's Randy Jordan. In late 2019, Ronnie described himself as "running" Mowbray's.

70.     The above-described misrepresentations, omissions, and conduct did, in fact, deceive Flexible as Flexible would not have continued to provide funding to GCLC or purchased receivables from GCLC but for them.

71.     As a direct and proximate result of Mowbray's actions and omissions, Flexible extended funding to GCLC enabling it to purchase fictitious invoices from GCLC, causing substantial harm to Flexible's business in an amount to be

determined at trial.

72.    Mowbray's conduct alleged herein was done willfully, wantonly, in bad faith, and in reckless disregard to Flexible's rights.

73.    Consequently, Mowbray's is liable to Flexible in the amount of at least $17 million, plus other amounts, together with punitive damages, interests, costs, and attorneys' fees as allowable by law.

## SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Fraud)

74.    The previous allegations are re-alleged and incorporated by reference as if completely set forth.

75.    Mowbray's had actual knowledge that GCLC was engaged in an ongoing invoice factoring fraud and was submitting fraudulent invoices and ineligible receivables for purchase to Flexible.

76.    Mowbray's actually and substantially assisted GCLC in the fraud by among other things, (i) agreeing not to take action that could interfere with GCLC's submission of fraudulent and not Eligible Receivables for purchase; (ii) failing to notify or alert Flexible of its discovery of GCLC's fraudulent scheme; (iii) agreeing to GCLC and Randy Jordan's requests that Mowbray's refrain from making any statements that would disclose or tip off Flexible when Flexible was making inquiries and conducting its due diligence.

77.    As a direct and proximate result of Mowbray's actions and omissions, Flexible extended funding to GCLC enabling it to purchase fictitious invoices from GCLC, causing substantial harm to Flexible's business in an amount to be

determined at trial.

78.     Mowbray's conduct alleged herein was done willfully, wantonly, in bad faith, and in reckless disregard to Flexible's rights.

79.     Consequently, Mowbray's is liable to Flexible in the amount of at least $17 million, plus other amounts, together with punitive damages, interests, costs, and attorneys' fees as allowable by law.

### THIRD CLAIM FOR RELIEF

**(Fraudulent Concealment/Misrepresentation)**

80.     The previous allegations are re-alleged and incorporated by reference as if completely set forth.

81.     Mowbray's intentionally made false statements of material fact to Flexible when Flexible was conducting due diligence, including but not limited to Mr. Phang's statements to Ms. Rouah of Flexible on June 2, 2020, that "there were a lot of invoices that GCLC are waiting approval from PG&E" when he knew this statement to be false. This statement was made at a time when Mowbray's compared the invoices submitted by GCLC to Flexible with the invoices submitted by GCLC to Mowbray's and noted internally the considerable disparity.

82.     Mowbray's knew that there were not a lot of invoices from GCLC that were awaiting approval from PGE. To the contrary, Mowbray's knew that GCLC was "duplicating" invoices and "making [invoices] up" to get Flexible to purchase worthless receivables from GCLC. But Mowbray's did not disclose the facts to Flexible because of Mowbray's and GCLC's close relationship and Mowbray's fear of "what they [Flexible] will do to GCL[.]"

83.    Mowbray's intended Flexible to rely on the representation and Flexible reasonably relied on the representation. Flexible was harmed and Flexible's reliance on Mowbray's representation was a substantial factor in causing Flexible's harm.

84.    Mowbray's had a duty to disclose GCLC's fraud to Flexible. Flexible and Mowbray's were parties to the AR Financing Agreement which imposed certain duties on Mowbray's relating to goods or services provided by any subcontractor, including ensuring that such accounts receivable were genuine, collectible, and not subject to offset, and that the facts, figures, and representations relating to subcontractors were true and correct. (AR Financing Agreement, ¶¶ 3.2.2, 21.3.2). Moreover, that the information submitted by Mowbray's to Flexible was not to "knowingly and willfully contain untrue statements of material fact or omit material facts." (AR Financing Agreement, ¶ 21.8).

85.    Nevertheless, Mowbray's concealed from Flexible the fact that the receivables that Flexible purchased from GCLC -its subcontractor - were fake, fraudulent, misstated, or ineligible. Upon Flexible's inquiries, Mowbray's had ample opportunity to present Flexible with all the facts, but it deliberately chose not to do so. Instead, Mowbray's spun half-truths, offering vague brush-off explanations like "we deducted a lot of Equipment Rental, Expense reimbursement and other deductions[,]" and incomplete representations like "they [GCLC] send me [latest GCL Aging] this morning, I am not aware of any other outstanding invoices in your statement from GCL" and "[w]e paid up to date on all GCL invoices except the attach list, which we have not process or confirm from PG&E to pay GCL yet." Moreover,

Mowbray's on numerous occasions, under Randy Jordan's directives, chose not to send material information to Flexible.

86.     Mowbray's owed Flexible a duty to disclose GCLC's fraud given that it knew partial and incomplete representations would mislead Flexible about the legitimacy and the propriety of the invoices at the heart of Flexible's financing relationship with GCLC. Mowbray's breached this duty by failing to disclose to Flexible that GCLC was "duplicating" and "making [invoices] up" and by failing to provide Flexible with accurate and complete information.

87.     GCLC's fraud was only known to Mowbray's, and Mowbray's knew that the facts were not known or reasonably discoverable by Flexible. When Flexible attempted to obtain information, Mowbray's worked with GCLC to conceal the information from Flexible.

88.     Had Mowbray's revealed to Flexible GCLC's fraud, Flexible would have immediately stopped financing GCLC's operations and purchasing ineligible invoices.

89.     Flexible was harmed and Mowbray's concealment was a substantial factor in causing Flexible's harm.

90.     Mowbray's perpetrated a fraud on Flexible and, Flexible may hold Mowbray liable. Mowbray's conduct was willful, wantonly, in bad faith, and in reckless disregard to the rights of Flexible.

91.     As a direct and proximate result of Mowbray's actions and omissions, Flexible continued funding to GCLC and continued to purchase ineligible and worthless receivables, causing substantial harm to Flexible's business in an amount

to be determined at trial. The damage to Flexible was so severe that it needed to file bankruptcy.

92.     Consequently, Mowbray's is liable to Flexible in the amount of at least $17 million plus other directly related damage amounts, to be determined at trial, together with punitive damages, interests, costs, and attorneys' fees as allowable by law.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

93.     The previous allegations are re-alleged and incorporated by reference as if completely set forth.

94.     Mowbray's made false statements of material fact to Flexible when Flexible was conducting due diligence, including but not limited to Alan's statements to Ms. Rouah of Flexible on June 2, 2020, that "there were a lot of invoices that GCLC are waiting approval from PG&E[.]" This statement was not true. Moreover, Mowbray's had no reasonable grounds for believing the representation was true when it was made. This statement was made at a time when Mowbray's compared the invoices submitted by GCLC to Flexible with the invoices submitted by GCLC to Mowbray's and noted internally the considerable disparity. Mowbray's also knew that GCLC were "duplicating" invoices and "making [invoices] up" to get Flexible to purchase worthless receivables from GCLC.

95.     Upon Flexible's inquiries, Mowbray's had ample opportunity to present Flexible with all the facts, but it deliberately chose not to do so. Instead, Mowbray's spun half-truths, offering vague brush-off explanations like "we deducted a lot of

Equipment Rental, Expense reimbursement and other deductions[,]" without providing the details. Mowbray also provided incomplete and partial representations like "they [GCLC] send me [latest GCL Aging] this morning, I am not aware of any other outstanding invoices in your statement from GCL" and "[w]e paid up to date on all GCL invoices except the attach list, which we have not process or confirm from PG&E to pay GCL yet."

96.    Mowbray's owed Flexible a duty to disclose GCLC's fraud given that it knew that its partial and incomplete representations would mislead Flexible about the legitimacy of GCLC's invoices. Mowbray's owed this duty, in part, by virtue of being a party to the AR Financing Agreement with Flexible and also by virtue of Mowbray's relationship with GCLC with special knowledge of GCLC's conduct.

97.    Mowbray's breached this duty by failing to disclose to Flexible any of the fraudulent conduct that it had come to learn over the course of its relationship with GCLC.

98.    Mowbray's intended that Flexible rely on Mowbray's representations and Flexible reasonably relied on Mowbray's representations as GCLC's general contractor.

99.    As a direct and proximate result of Mowbray's actions and omissions, Flexible continued funding GCLC and continued to purchase ineligible and worthless receivables, causing substantial harm to Flexible's business in an amount to be determined at trial. The damage to Flexible was so severe that it needed to file bankruptcy.

100.    Consequently, Mowbray's is liable to Flexible in the amount of at least $17 million, plus other amounts to be determined at trial.

## <u>FIFTH CLAIM FOR RELIEF</u>
### (Breach of Contract)

101.    The previous allegations are re-alleged and incorporated by reference as if completely set forth.

102.    Flexible and Mowbray's were parties to the AR Financing Agreement.

103.    Flexible did all the significant things that the AR Financing Agreement required it to do, including but not limited to establishing and maintaining for Mowbray's benefit a credit line.

104.    Mowbray's on the other hand failed to perform under the terms of the contract, including but not limited to:

- violating provision 3.2.2 by failing to make all reasonable efforts to ensure that the goods and services provided by GCLC were genuine, bona fide and collectable and not subject to dispute, right of offset, counterclaim or right of return or cancellation;

- violating provision 3.4 by failing to immediately notify Flexible in writing when Mowbray was notified by PGE of any disputes, or of any right of offset, counterclaim or right of return or cancellation against PGE's obligation to pay Mowbray;

- violating provision 21.3 by failing to make all reasonable efforts to ensure that facts, figures, and representations to Flexible relating to goods and services provided by GCLC were true and correct;

- violating provision 21.8 by providing information that knowingly and willfully contained untrue statements of material fact and omitting material facts.

105.    Flexible was harmed by Mowbray's violations and Mowbray's breaches were a substantial factor in causing Flexible's harm.

106.    Consequently, Mowbray's is liable to Flexible in the amount of at least $4.25 million, plus other amounts to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Objection to Mowbray's Proof of Claim)

107.    The previous allegations are re-alleged and incorporated by reference as if completely set forth.

108.    Mowbray's has filed Proof of Claim No. 12.

109.    Flexible hereby objects to this Proof of Claim because: (1) the claim is subject to setoff, recoupment, and/or withholding based upon the affirmative claims for relief asserted by Flexible in this action; (2) the claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); and (3) the claim should be disallowed under 11 U.S.C. 502(b)(1).

///

///

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Flexible prays for entry of judgment against Mowbray's on the above claims for relief as follows:

A.  Awarding monetary damages in amount to be proven at trial;

B.  Equitably subordinating Mowbray's Proof of Claim under 11 U.S.C. § 510(c)(1);

C.  Authorizing setoff, recoupment, and/or withholding against Mowbray's Proof of Claim;

D.  Disallowing Mowbray's Proof of Claim under 11 U.S.C. 502(b)(1);

E.  Awarding pre-judgment interest at the maximum rate allowable by law and/or equity;

F.  Awarding reasonable attorneys' fees and costs to the extent permissible by applicable law; and

G.  Granting such other and further relief as the Court deems just and proper.

Dated:  March 22, 2024             SULLIVAN BLACKBURN PRATT LLP

*/s/ Christopher D. Sullivan*
Christopher D. Sullivan
(CA   State   Bar   No.148083)
(Admitted *Pro Hac Vice*)

30

# EXHIBIT A

## ACCOUNTS RECEIVABLE FINANCING AGREEMENT

This ACCOUNTS RECEIVABLE FINANCING AGREEMENT (this "*Agreement*") is made on March **20**, 2019 by and between:

**FLEXIBLE FUNDING LTD. LIABILITY CO.** ("FLEXIBLE FUNDING"), with offices at One Embarcadero Center, Suite 1510, San Francisco, California 94111, and **THE ORIGINAL MOWBRAY'S TREE SERVICE INC.** (hereafter "MOWBRAY"), with offices at 1845 Business Center Drive, Suite 215, San Bernardino, California 92408. The parties hereto hereby agree as follows:

FLEXIBLE FUNDING hereby agrees to provide MOWBRAY services as more fully set forth and specified in this Agreement. Such services shall include: (1) establishing and maintaining for MOWBRAY's benefit an "open end" credit program, as defined under California Financial Code § 26500 (the "*Credit Line*"), using as collateral the assignment by MOWBRAY to FLEXIBLE FUNDING of accounts receivable ("*Accounts Receivable*") that result from services and sales provided by MOWBRAY to SCE Corp., d/b/a Southern California Edison ("*SCE*") and to Pacific Gas & Electric Company ("*PG&E*") (*SCE* and *PG&E*, "*Eligible Account Debtors*"), and security interests in the other "*Collateral*" as defined in paragraph 14 below, provided, however, with respect to *Accounts Receivable* payable by *PG&E*, such *Accounts Receivable* shall be limited to those created on and after January 30, 2019, (2) administering the *Accounts Receivable* created thereby; and (3) providing such other services as more fully described in this Agreement. This Agreement constitutes the sole understanding between the parties and modification may only be made by a written amendment executed by both parties.

The laws of the State of California and the California Commercial Code shall govern the construction of this Agreement and the rights and duties of the parties hereunder. All terms used and not otherwise defined herein shall have the meaning set forth in the Uniform Commercial Code adopted in the State of California ("*UCC*").

## ACCOUNTS MANAGEMENT

1.    MOWBRAY shall, before execution of any agreement with an *Eligible Account Debtor* in connection with which MOWBRAY desires FLEXIBLE FUNDING to provide services under this Agreement, provide to FLEXIBLE FUNDING the *Eligible Account Debtor's* legal name, address, phone number, and other information that may be requested by FLEXIBLE FUNDING. FLEXIBLE FUNDING may conduct a credit investigation of each *Eligible Account Debtor* in FLEXIBLE FUNDING's sole discretion. In addition, FLEXIBLE FUNDING may notify MOWBRAY of such investigation and share information so received. FLEXIBLE FUNDING shall advise MOWBRAY of the acceptance or rejection of each *Eligible Account Debtor* submitted for funding, and may establish a maximum credit limit for the *Eligible Account Debtor*, without waiving its right at any subsequent time to terminate or modify any such acceptance.

2.    MOWBRAY shall provide to FLEXIBLE FUNDING each week with the information described below in content and format acceptable to FLEXIBLE FUNDING (hereafter an "*Invoice Pack*"):

2.1    Detail of all outstanding *Accounts Receivable* (which may include, but not limited to, invoices, aging reports, spreadsheets, access to accounting programs, and/or access to online portals);

2.2    Supporting information for all *Accounts Receivable* included in an *Invoice Pack*, including supporting information for all invoices and other work of subcontractors, agents and independent contractors of MOWBRAY that are submitted to MOWBRAY, or that constitute any portion of, or that are included in, any invoice or other request for payment submitted by MOWBRAY to an *Eligible Account Debtor* that result in any *Account Receivable* included in such *Invoice Pack*, which may also include, but not be limited to, signed time cards, timecard data or access, access to online portals identifying timecard information); and

2.3    A listing of all unpaid *Accounts Receivable*.

2.4    To the extent an *Eligible Account Debtor* has accepted any invoice from MOWBRAY (either as-submitted or after any agreed-upon adjustment with MOWBRAY) by confirmation to MOWBRAY thereof, and MOWBRAY has not previously submitted such resulting *Account Receivable* in an *Invoice Pack* to FLEXIBLE FUNDING, MOWBRAY shall only be required to provide the information described in paragraph 2.2 above relating to subcontractors, agents and independent contractors of MOWBRAY included in such *Account Receivable* upon request by FLEXIBLE FUNDING.

3.    MOWBRAY warrants and guarantees that:

3.1    With respect to the goods and services provided to each *Eligible Account Debtor* that are described within each *Invoice Pack*:

3.1.1.    If provided directly by MOWBRAY to such *Eligible Account Debtor*, such goods and services were in fact provided or rendered on the date(s) and in the amount(s) described in the *Invoice Pack*; and

3.1.2.    If provided by any subcontractor, agent or independent contractor of MOWBRAY, MOWBRAY will make all reasonable efforts to ensure that such goods and services were in fact provided or rendered on the date(s) and in the amount(s) described in the *Invoice Pack*.

1

3.2    With respect to each *Account Receivable* that is submitted for funding and described in an *Invoice Pack*:

    3.2.1.    To the extent relating to goods or services provided directly by MOWBRAY to the related *Eligible Account Debtor*, such *Account Receivable* (or portion thereof) is then and will continue to be genuine, bona fide and collectable, not subject to dispute, right of offset, counterclaim or right of return or cancellation; and

    3.2.2.    To the extent relating to goods or services provided by any subcontractor, agent or independent contractor of MOWBRAY, MOWBRAY will make all reasonable efforts to ensure that such *Account Receivable* (or portion thereof) is then and will continue to be genuine, bona fide and collectable and not subject to dispute, right of offset, counterclaim or right of return or cancellation.

3.3    Each *Account Receivable* that is submitted for funding and described in an *Invoice Pack* constitutes an *Eligible Accounts Receivable* (as defined in paragraph 10.1 below).

3.4    That MOWBRAY will immediately notify FLEXIBLE FUNDING, in writing if MOWBRAY is notified (in writing, by electronic communication or by telephone) by any *Eligible Account Debtor* of any disputes, or of any right of offset, counterclaim or right of return or cancellation against such *Eligible Account Debtor's* obligation to pay any *Account Receivable*, or portion thereof, to MOWBRAY.

4.    After submission of an *Invoice Pack* which includes a request for funds, FLEXIBLE FUNDING shall provide to MOWBRAY a loan report that captures the current state of MOWBRAY's *Credit Line* account: e.g., current *Accounts Receivable* balance; new billings and new collections (since the prior loan request), the *Loanable Amount* (as defined in paragraph 11.1 below), and the current funding request and associated funding fees ("*Loan Report*"). MOWBRAY agrees that it will, within ten (10) days, notify FLEXIBLE FUNDING of dispute with any of the entries of the *Loan Report*.

5.    **MOWBRAY agrees that all invoices to *Eligible Account Debtors* for *Accounts Receivable* shall designate MOWBRAY as the named payee, with specific remittance instructions as FLEXIBLE FUNDING designates to MOWBRAY from time to time. Currently the designated address is P.O. Box 7064, San Francisco, CA 94120, or electronically deliver to the following FLEXIBLE FUNDING account: Bank Name: Wells Fargo Bank • ABA: 121000248 • Account Name: Flexible Funding • Account No: 4428952527 • Phone: 415-391-4320.**

6.    **The only address on invoices shall be the remittance address designated above (P.O. Box 7064, San Francisco, CA 94120). If any payment is received by MOWBRAY, either physically or electronically:**

6.1    MOWBRAY shall hold such payment irrevocably in trust for FLEXIBLE FUNDING, separate and apart from MOWBRAY'S own funds;

6.2    MOWBRAY shall deliver such payment within one (1) business day to FLEXIBLE FUNDING in the identical form in which it was received (except for the endorsement or assignment of MOWBRAY where necessary);

6.3    MOWBRAY shall promptly notify the *Eligible Account Debtor* in writing to send future payments as set forth in paragraph 5 above.

MOWBRAY shall execute all authorizations or other documents requested to establish and maintain FLEXIBLE FUNDING's authority to accept, endorse and deposit all *Eligible Account Debtor* remittances to the bank account of FLEXIBLE FUNDING. MOWBRAY hereby appoints FLEXIBLE FUNDING as its agent for the purpose of executing all authorizations or other documents to establish and maintain FLEXIBLE FUNDING's authority to accept, endorse and deposit all electronic *Eligible Account Debtor* remittances (such as ACH) to the bank account of FLEXIBLE FUNDING.

7.    All funds credited to the payment of the *Credit Line* are conditional upon final payment to FLEXIBLE FUNDING in cash or solvent credits of the items giving rise to such funds. If any item credited to the payment of the *Credit Line* is not paid to FLEXIBLE FUNDING or payment thereof is rescinded or required to be returned by FLEXIBLE FUNDING, the amount of any credit given for such item shall be charged to the balance of the *Credit Line* whether or not the item is returned.

8.    Upon request from MOWBRAY entered through FLEXIBLE FUNDING's online portal, FLEXIBLE FUNDING shall forward within one (1) business day to MOWBRAY a loan and collection report summarizing all current transactions to and from MOWBRAY's *Credit Line* account.

9.    In the event that after the application of collections to the outstanding principal amount of the *Credit Line* and all interest, fees, costs, expenses and other amounts payable to FLEXIBLE FUNDING hereunder, the *Credit Line* is temporarily in a credit position, FLEXIBLE FUNDING shall remit to MOWBRAY the amount of such credit within 1 business day of receipt of written request from MOWBRAY for the payment thereof.

## ADVANCES; COMPENSATION TO FLEXIBLE FUNDING

10.    Subject to the terms of this Agreement, upon receipt of a funding request and the related *Invoice Pack* from MOWBRAY entered on a business day through FLEXIBLE FUNDING's online portal, subject to the terms of this Agreement FLEXIBLE FUNDING shall, within one (1) business day, advance funds from the *Credit Line* to such bank account as MOWBRAY shall

2

designate. The amount of each such advance shall be specified on the *Loan Report* with the maximum advance equal to the *Loanable Amount* (as defined in paragraph 11.1 below).

11.    All advances of the *Credit Line* shall be calculated as set forth below and as agreed to in the FLEXIBLE FUNDING *Loan Report*:

11.1    The total amount of funds available to MOWBRAY under the *Credit Line* at any time shall be a sum (the "*Loanable Amount*") equal to (a) the lesser of the *Limit* (as defined in paragraph 11.2 below), and 85% of the aggregate net face amount of all outstanding and unpaid *Accounts Receivable* from *Eligible Account Debtors* that satisfy all other terms and conditions of this Agreement and that are (collectively, "*Eligible Accounts Receivable*"): (1) not over **90 days** unpaid; (2) not subject to any counterclaim, defense, dispute, right of setoff or recoupment by the *Eligible Account Debtor* or any other person; (3) not payable by an affiliate of MOWBRAY; (4) not subject to any lien, security interest or other encumbrance other than in favor of FLEXIBLE FUNDING; (5) not subject to assignment or transfer in favor of any person other than FLEXIBLE FUNDING; (6) not payable by an *Eligible Account Debtor* that is insolvent, that has declared bankruptcy, that is subject to an involuntary bankruptcy proceeding, or that has commenced any proceeding under any federal, state or local law relating to liquidation, receivership, insolvency, reorganization, or otherwise affecting the rights of creditors generally; *provided, however,* the provisions of this clause 6 shall not apply to *Accounts Receivable* owing from *PG&E* that were created after the commencement of *PG&E's* bankruptcy case on January 29, 2019 (the "*PG&E Petition Date*") to the extent such *PG&E Accounts Receivable* otherwise satisfy all requirements for *Eligible Accounts Receivable* under this Agreement; and (7) not disqualified by FLEXIBLE FUNDING for credit or other reason(s) in FLEXIBLE FUNDING's sole discretion (the sum of the amounts described in clauses (1) through this (7), inclusive, the "*Borrowing Base*"); *minus* (b) the aggregate outstanding principal amount of the *Credit Line.*

11.2    In no event shall the outstanding principal balance of the *Credit Line* at any time exceed, without FLEXIBLE FUNDING's prior written approval, **$12,000,000.00** (Twelve Million and 00/100 Dollars, the "*Limit*"). In the event that the outstanding principal balance owing on the *Credit Line* under this Agreement exceeds the lesser of the *Limit* or *Borrowing Base*, as determined by FLEXIBLE FUNDING, MOWBRAY understands and agrees that there shall be no further advances on the *Credit Line* to the undersigned unless and until MOWBRAY pays the amount of such excess (the "*Over Advance*"), and MOWBRAY hereby promises to pay any *Over Advance* upon demand of FLEXIBLE FUNDING.

11.3    MOWBRAY agrees, in consideration for funds loaned to it by FLEXIBLE FUNDING under this Agreement, to pay to FLEXIBLE FUNDING interest on the outstanding principal amount of the *Credit Line* ("*Accrued Interest*") until all *Obligations* (as defined in paragraph 25 below) are paid to FLEXIBLE FUNDING in cash, in full. In the absence of an *Event of Default* (as defined in paragraph 25 below), the outstanding principal balance of the *Credit Line* shall bear interest at fluctuating rate that, when annualized, is equal to the greater of (a) U.S. Prime Rate as quoted in the Wall Street Journal, Money Rates Section as the Prime Rate (the "*Prime Rate*"), plus eight and seventy-five hundredths percent (8.75%), or (b) fourteen and twenty-five hundredths percent (14.25%) (the "*Ordinary Rate*"). Upon the occurrence of any *Event of Default*, interest on the outstanding principal amount of the *Credit Line* shall accrue at a rate equal to the then-applicable *Ordinary Rate* **plus** five percent (5.00%) *per annum* (the "*Default Rate*"). Interest shall be computed on the basis of a year consisting of three hundred sixty (360) days for the number of days actually elapsed, and shall be payable (each such date, an "*Interest Payment Date*") monthly in arrears commencing on the first business of the calendar month immediately following the date of this Agreement, on the first business day of each calendar month thereafter, upon demand by FLEXIBLE FUNDING following the occurrence of any *Event of Default* (other than any *Event of Default* described in paragraphs 25.2 or 25.3 below), immediately upon the occurrence of *Event of Default* described in paragraphs 25.2 or 25.3 below, on the *Termination Date* (as defined in paragraph 24 below), and following the *Termination Date* or any *Event of Default*, upon demand by FLEXIBLE FUNDING until all *Obligations* are paid to FLEXIBLE FUNDING in cash, in full. For the purpose of computing *Accrued Interest*, interest shall continue to accrue on the amount of any funds credited to the payment of the *Credit Line* for a period of five (5) business days after the date so credited.

12:    In addition to *Accrued Interest*, as compensation for FLEXIBLE FUNDING'S services provided for in this Agreement, MOWBRAY agrees to pay to FLEXIBLE FUNDING:

12.1    A *Collateral Management Fee* equal to one-tenth percent (0.10%) of the *Limit*, payable monthly in arrears on each *Interest Payment Date.*

12.2    An *Unused Line Fee* equal to the positive difference between Fifteen Thousand and 00/100 Dollars ($15,000.00) and the *Accrued Interest* payable in any month. No *Unused Line Fee* shall be payable if *Accrued Interest* payable in any month exceeds Fifteen Thousand and 00/100 Dollars ($15,000.00). The *Unused Line Fee* shall be calculated as of the end of each month and shall be payable on each *Interest Payment Date*. The *Unused Line Fee* shall be pro-rated for any partial month under this Agreement.

12.3    A *Credit Coverage Fee* equal to the cost to FLEXIBLE FUNDING for credit insurance for *PG&E Eligible Accounts Receivable* for which MOWBRAY's requests financing under the *Credit Line*. The *Credit Coverage Fee* shall be calculated as of the end of each month and shall be payable on each *Interest Payment Date.*

12.4    *Liquidated Damages* in amount equal to two percent (2.00%) of the *Limit* in the event that prior to the *Termination Date* (a) MOWBRAY prepays the *Credit Line* pursuant to paragraph 31 below, or (b) pursuant to the terms of this Agreement, either (i) FLEXIBLE FUNDING demands repayment of the *Credit Line* and the other *Obligations*, in whole or in part, following the occurrence of an *Event of Default* (other than an *Event of Default* described in paragraphs 25.2 or 25.3 below), or (ii) repayment of the *Credit Line* and the other *Obligations* are accelerated in whole or in part upon the occurrence of an Event of Default described

3

in paragraphs 25.2 or 25.3 below. MOWBRAY acknowledges and agrees that *Liquidated Damages* shall be payable in the amount described above notwithstanding any acceleration of repayment and/or the maturity date of the *Credit Line* pursuant to paragraph 25 below. FLEXIBLE FUNDING and MOWBRAY each hereby acknowledges and agrees that it would be impractical and extremely difficult to ascertain FLEXIBLE FUNDING's actual damages from early termination of the *Credit Line*, and that the *Liquidated Damages* has been arrived at by mutual agreement of FLEXIBLE FUNDING and MOWBRAY as to a reasonable calculation of FLEXIBLE FUNDING's lost profits as a result of early termination of the *Credit Line*. FLEXIBLE FUNDING and MOWBRAY each further hereby acknowledges and agrees that the *Liquidated Damages* provided above is intended to be fair and reasonable approximations of FLEXIBLE FUNDING's actual damages from early termination of the *Credit Line*, are presumed to be the amount of damages sustained by FLEXIBLE FUNDING as a result of such early termination, are reasonable under the circumstances currently existing, and that the *Liquidated Damages* are liquidated damages are not intended to be penalties.

13.    MOWBRAY agrees that FLEXIBLE FUNDING may (a) charge all interest, fees, costs and expenses payable by MOWBRAY to FLEXIBLE FUNDING pursuant to the terms of this Agreement (including any amount paid by FLEXIBLE FUNDING and required to be reimbursed by MOWBRAY pursuant to the terms of this Agreement) to the *Credit Line*, (b) pay such amounts to FLEXIBLE FUNDING from the proceeds of the *Credit Line*, and (c) treat each such payment as an advance of the *Credit Line* on the date proceeds of the *Credit Line* above are paid to FLEXIBLE FUNDING as described above. MOWBRAY has paid to FLEXIBLE FUNDING a good faith deposit of $5,000 against all expenses. The deposit, less all expenses, will be applied to any amounts due to FLEXIBLE FUNDING.

## GRANT OF SECURITY INTEREST; COLLATERAL

14.    MOWBRAY hereby pledges, assigns and grants to FLEXIBLE FUNDING a continuing lien upon and security interest in and to all of MOWBRAY's rights, title and interests in and to the following, wherever located and whether owned on the effective date of this Agreement or thereafter acquired, whether owned or held by MOWBRAY or by any other person in any manner for MOWBRAY's account (and specifically including all accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of all of the following), and as such terms are defined in the UCC (hereinafter the "*Collateral*"):

With the exception of all *Accounts Receivable* that may result from services and sales provided by MOWBRAY on or prior to January 29, 2019, all cash, money, accessions, accounts, as-extracted collateral, certificates of title, chattel paper and all rights to payment in connection therewith, commercial tort claims, deposit accounts, documents, electronic chattel paper and all rights to payment in connection therewith, equipment, fixtures, general intangibles, goods, health-care-insurance receivables, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, proceeds, records (including but not limited all to books and records pertaining to any of the items or subject matter described in this paragraph), software, supporting obligations, all rights to payment for money or funds advanced or sold, and all money or other property of any kind now or at any time or times hereafter in the possession or under the control of FLEXIBLE FUNDING or any affiliate of FLEXIBLE FUNDING or any representative, agent or correspondent of FLEXIBLE FUNDING pertaining to any of the items or subject matter described in this paragraph, and to the extent not otherwise included in the foregoing, all other property in which a Security Interest or other Lien may be granted under the UCC or which may be delivered to and held by FLEXIBLE FUNDING pursuant to the terms of this Agreement

15.    The pledge, assignment lien and security interest granted to FLEXIBLE FUNDING pursuant to this Agreement shall continue in full force and effect until all *Obligations* have been finally and indefeasibly paid to FLEXIBLE FUNDING in cash and all other obligations of MOWBRAY hereunder have been performed in full (including the execution and delivery of a release to FLEXIBLE FUNDING as described in paragraph 27.2 below), notwithstanding the termination of FLEXIBLE FUNDING's obligations to extend credit to MOWBRAY under this Agreement, the full or partial termination (whether by prepayment, demand or acceleration) of the *Credit Line*, in whole or in part, or that the *Credit Line* may from time to time be temporarily in a credit position. Any balances to the credit of MOWBRAY in the possession of FLEXIBLE FUNDING, and any other property or assets of MOWBRAY in the possession of FLEXIBLE FUNDING, shall be held by FLEXIBLE FUNDING as *Collateral*, and applied in whole or partial satisfaction of the amounts payable to FLEXIBLE FUNDING hereunder when due, subject to the terms of this Agreement. FLEXIBLE FUNDING shall not have any obligation to release any security interest, lien or other encumbrance in, on or to any of the *Collateral*, unless and until all of the requirements of paragraph 27 below have been fully satisfied and performed. At all times prior to the final and indefeasible payment to FLEXIBLE FUNDING in cash of all amounts payable to FLEXIBLE FUNDING pursuant to the terms of this Agreement, Lender shall have, in addition to all other rights, powers, remedies and privileges of FLEXIBLE FUNDING under this Agreement (a) all rights, powers, remedies and privileges granted to a secured party under the UCC, and (b) all rights, powers, remedies and privileges with respect to the *Collateral* granted to FLEXIBLE FUNDING under any other agreement, document or instrument executed and/or delivered to FLEXIBLE FUNDING in connection with the transactions contemplated by this Agreement, and (c) all rights, powers, remedies and privileges of FLEXIBLE FUNDING with respect to the *Collateral* available under applicable law.

16.    MOWBRAY will execute and deliver to FLEXIBLE FUNDING security agreements, assignments (including, without limitation, assignments of specific accounts, *Accounts Receivable*, certificates of title, chattel paper, documents, instruments, goods, inventory, equipment and general intangibles), control agreements, mortgages, deeds of trust, collateral assignments, and other documents and instruments as FLEXIBLE FUNDING may at any time reasonably request to establish, evidence, attach, perfect, or protect any security interest, pledge, lien, charge, mortgage or other encumbrance granted to FLEXIBLE FUNDING. MOWBRAY

4

authorizes FLEXIBLE FUNDING to file all financing statements (including, without limitation, describing the *Collateral* as "all assets" or "all personal property," whether owned or hereafter acquired), and all continuations or amendments thereof, to establish, evidence attach, perfect or protect any security interest, pledge, lien, charge, mortgage or other encumbrance granted to FLEXIBLE FUNDING in the *Collateral*.

17.    Except for the liens, security interests, pledges or other encumbrances described on Schedule 17 attached hereto, MOWBRAY covenants and agrees that it shall not grant or give, or suffer to permit, any lien, security interest, pledge or other encumbrance in, on or to the *Collateral*, in whole or in part, without FLEXIBLE FUNDING's prior written consent, which consent will be granted or withheld in FLEXIBLE FUNDING's sole discretion.

18.    MOWBRAY hereby irrevocably appoints FLEXIBLE FUNDING its agent for the purpose of executing and filing any financing statement or similar document which may be necessary to perfect and continue perfected such security interest under the Uniform Commercial Code. MOWBRAY hereby approves and ratifies any financing statement filed by FLEXIBLE FUNDING against MOWBRAY prior to the effective date of this Agreement. MOWBRAY agrees to not further encumber the *Collateral* described herein.

19.    FLEXIBLE FUNDING may, in its sole discretion, decide to assist the efforts to require *Eligible Account Debtors* to pay *Accounts Receivable* obligations directly to the payment instructions outlined in Paragraph 5 above, with the following actions: (i) notify any *Eligible Account Debtor* that its *Account Receivable* has been assigned to FLEXIBLE FUNDING by MOWBRAY and that payment thereof shall be made to the order of and directly to FLEXIBLE FUNDING and/or (ii) demand, collect or enforce payment of any *Accounts Receivable*; and/or (iii) communicate directly with MOWBRAY's *Eligible Account Debtors* to verify the amount and validity of any invoice created by MOWBRAY.

20.    MOWBRAY shall not, without FLEXIBLE FUNDING's prior written consent in each instance: (a) grant an extension of time for payment of any *Account Receivable*; (b) compromise or settle any *Account Receivable*; (c) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any *Account Receivable*.

21.    MOWBRAY warrants and represents that (except insofar as MOWBRAY and FLEXIBLE FUNDING have expressly otherwise agreed in writing):

21.1    The *Collateral* is free and clear of all liens, encumbrances, security interests and adverse claims other than such as were created by this Agreement in favor of FLEXIBLE FUNDING and those described on Schedule 17 attached hereto.

21.2    All *Accounts Receivable* included in the calculation of the *Loanable Amount* will, when assigned and at all times thereafter, be due and unconditionally payable on terms acceptable to FLEXIBLE FUNDING but never more than ninety (90) days from invoicing, and will conform to the terms expressly set forth on the face of the relevant invoice; no account will be past due at the time assigned.

21.3    With respect to all facts, figures, representations given, or caused to be given by MOWBRAY to FLEXIBLE FUNDING in connection with the value of the invoices assigned hereunder:

21.3.1.    If relating to goods and services provided directly by MOWBRAY to the related *Eligible Account Debtor*, such facts, figures and representations will be true and correct; and

21.3.2.    If relating to goods and services provided by any subcontractor, agent or independent contractor of MOWBRAY, MOWBRAY will make all reasonable efforts to ensure that such facts, figures and representations will be true and correct.

21.4    MOWBRAY's books and records do and will fully and accurately reflect all of MOWBRAY's assets and liabilities (absolute and contingent), have been and will be kept in the ordinary course of business in accordance with generally accepted accounting principles consistently applied and all information contained therein is and will be true and correct.

21.5    All taxes of any governmental or taxing authority due or payable by, or imposed or assessed against, MOWBRAY, have been paid and will be paid in full before delinquency.

21.6    Except for the matters described on Schedule 21.6 attached hereto, there are no actions or proceedings pending by or against MOWBRAY before any court or administrative agency, and there are no pending, threatened, or imminent governmental investigations, or claims, complaints, or prosecutions involving MOWBRAY.

21.7    MOWBRAY has the legal power and authority to enter into this Agreement and to perform and discharge MOWBRAY's obligations hereunder.

21.8    No information furnished by or on behalf of MOWBRAY (including but not limited to facts, figures, and representations given) shall knowingly and willfully contain untrue statements of material fact or omit material facts.

22.    Each warranty and representation contained in this agreement shall be deemed repeated with each advance of funds and shall be conclusively presumed to have been relied on by FLEXIBLE FUNDING regardless of any investigation made, or information possessed by FLEXIBLE FUNDING. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements contained in any other document or instrument which MOWBRAY shall give, or cause to be given, to FLEXIBLE FUNDING, either now or hereafter. FLEXIBLE FUNDING's right to bring an action for breach of any such representation or to exercise any right, remedy, power or privilege under this Agreement based

5

upon the breach of any such representation shall survive the execution, delivery and acceptance of this Agreement, and the closing of the transactions described in this Agreement, until all amounts payable to FLEXIBLE FUNDING under this Agreement are finally and indefeasibly paid to FLEXIBLE FUNDING in cash in full.

23.    MOWBRAY hereby irrevocably appoints FLEXIBLE FUNDING and its designees MOWBRAY's true and lawful attorney in fact, to exercise after an *Event of Default,* all or any of the following powers until all *Obligations* have been fully, finally, and indefeasibly paid to FLEXIBLE FUNDING in full:

      23.1    Receive, take, endorse, assign, deliver, accept and deposit, in the name of FLEXIBLE FUNDING or MOWBRAY, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the *Accounts Receivable, Collateral* or the proceeds thereof; and

      23.2    Take or bring, in the name of FLEXIBLE FUNDING or MOWBRAY, all steps, actions, suits or proceedings deemed by FLEXIBLE FUNDING necessary or desirable to effect collection of or other realization upon the *Accounts Receivable* and/or other *Collateral;* and

      23.3    To extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all, or *Collateral* and discharge or release any account debtor or other obligor, without affecting any amounts due hereunder.

## TERM OF AGREEMENT

24.    Unless earlier terminated pursuant to the terms of this Agreement, this Agreement shall terminate on the 1st anniversary of the effective date of this Agreement (the *"Termination Date"*).  On the *Termination Date* MOWBRAY shall pay to FLEXIBLE FUNDING in cash the entire outstanding principal balance of the *Credit Line, plus* all accrued and unpaid interest thereon (whether *Accrued Interest* or at the *Default Rate),* plus all fees, costs, expenses and other amounts payable to Lender in connection with the *Credit Line,* plus all other amounts payable to Lender pursuant to the terms of this Agreement.  FLEXIBLE FUNDING shall not be obligated to make or continue to extend any advance of the *Credit Line* or continue an loan to MOWBRAY under the *Credit Line* after the *Termination Date.*

## EVENTS OF DEFAULT; TERMINATION BY FLEXIBLE FUNDING

25.    An event of default (*"Event of Default"*) shall be deemed to have occurred if any of the following occurs:

      25.1    MOWBRAY makes any false, misleading or untrue representation or warranty in connection with this Agreement, or fails to comply with any material provision of this Agreement; or

      25.2    MOWBRAY makes a general assignment for the benefit of its creditors other than FLEXIBLE FUNDING or commences or has commenced against it any proceeding under any Title of the Bankruptcy Code of the United States or under any similar law existing for the relief from creditors; or

      25.3    A Receiver or Trustee is appointed for MOWBRAY or any proceeding is instituted for the dissolution or full or partial liquidation of MOWBRAY; or

      25.4    A sale or transfer of fifty percent (50%) or more of the interests of MOWBRAY is effected in one or a series of related transactions without the prior written approval of FLEXIBLE FUNDING, which approval shall not be unreasonably withheld; provided, however, in the event a sale or transfer of fifty percent (50%) or more of the interests of MOWBRAY is effected in one or a series of related transactions due to the death of Gloria Mowbray, no Event of Default shall be deemed to have occurred if (i) within 60 calendar days of the death of Gloria Mowbray MOWBRAY causes the election of one or more persons to replace the duties and capacities of Gloria Mowbray as a director, officer and/or manager of MOWBRAY, as applicable, and each such person is acceptable to FLEXIBLE FUNDING, which acceptance shall not be unreasonably withheld or delayed, and (ii) each person described in clause (i) immediately above executes a Guaranty in favor of FLEXIBLE FUNDING in form and content identical to that which has been executed by Gloria Mowbray; or

      25.5    Any change occurs in MOWBRAY's business or business structure, including, without limitation, the ownership thereof, or financial condition, or disputes between principals/managers/officers, which causes FLEXIBLE FUNDING, in its sole discretion, to deem itself insecure; or

      25.6    Except for the liens, security interests, pledge and other encumbrances described on Schedule 17 attached hereto and described in paragraph 25.10, MOWBRAY grants any lien, security interest, pledge or other encumbrance in, on or to all or any portion of the *Collateral,* or evidence of any lien, security interest, pledge or other encumbrance filed or recorded with respect to all or any portion of the *Collateral,* and such lien, security interest, pledge or other encumbrance, or evidence thereof, has not been satisfactorily terminated, removed or discharged in FLEXIBLE FUNDING's sole discretion; or

      25.7    If, in connection with any subordination agreement between FLEXIBLE FUNDING and any third party whereby any indebtedness of MOWBRAY is subordinated to MOWBRAY's obligations to FLEXIBLE FUNDING, such subordination

6

agreement is amended without the consent of FLEXIBLE FUNDING or is breached or repudiated in any manner by a third party; or

25.8    MOWBRAY knowingly and willfully retains, or converts, moneys properly due to FLEXIBLE FUNDING hereunder, or fails to pay to FLEXIBLE FUNDING any of such sums within 3 calendar days after receipt of FLEXIBLE FUNDING's demand for payment of same; or

25.9    Any guarantor of MOWBRAY's obligations to FLEXIBLE FUNDING fails to perform or observe any of its obligations to FLEXIBLE FUNDING or notifies FLEXIBLE FUNDING of an intention to rescind, modify, terminate or revoke any guaranty, or any such guaranty ceases to be in full force and effect for any reason whatsoever; or

25.10    A federal, state or local tax lien is filed or recorded against MOWBRAY (i) if less than One Hundred Thousand Dollars ($100,000.00), such lien is not bonded or discharged in full, or other arrangements for the payment of all liabilities relating thereto have not been made to the satisfaction of FLEXIBLE FUNDING in its sole discretion, within fifteen (15) calendar days of the date of filing or recording thereof, or (ii) in an amount equal to or in excess of One Hundred Thousand Dollars ($100,000.00).

After the occurrence of an *Event of Default*, FLEXIBLE FUNDING may, in FLEXIBLE FUNDING's sole discretion, upon notice to MOWBRAY that an Event of Default has occurred (a) suspend or terminate FLEXIBLE FUNDING's obligations to make advances and/or render other services hereunder, (b) demand repayment of all amounts payable to FLEXIBLE FUNDING pursuant to this Agreement, including but not limited to, all outstanding and unpaid principal of the *Credit Line*, all *Accrued Interest* due thereon (including interest payable until all amounts payable to FLEXIBLE FUNDING hereunder are paid in cash in full), *Liquidated Damages* (to the extent payable pursuant to the terms hereof), and all fees, costs, expenses and other amounts payable to FLEXIBLE FUNDING under the terms of this Agreement (collectively, the "*Obligations*"), in which event MOWBRAY shall be obligated, without further demand, protest or notice of any kind, to pay immediately to FLEXIBLE FUNDING the full amount of all *Obligations*, in cash in full, and/or (c) take all other and further actions and avail itself of any and all rights, powers, remedies and privileges available to FLEXIBLE FUNDING under this Agreement, under any other agreement document or instrument executed and/or delivered to FLEXIBLE FUNDING in connection herewith, under the UCC or other applicable law, under law or in equity, including but not limited to, taking all steps deemed necessary to effect collection of the *Accounts Receivable* and otherwise dispose of the *Collateral* in accordance with the terms of this Agreement, the UCC and applicable law.

Notwithstanding the immediately preceding paragraph, upon the occurrence of any *Event of Default* described in either of paragraphs 25.2 or 25.3 above, without notice, demand or other action by FLEXIBLE FUNDING (a) all *Obligations* shall immediately become due and payable whether or not payable on demand prior to such *Event of Default*, and (b) all interest payable on the *Credit Line* shall immediately increase to the *Default Rate*, and (c) all obligations to lend to or extend credit to MOWBRAY under this Agreement, under any note and/or any other agreement, document or instrument between the parties shall immediately terminate, and (d) FLEXIBLE FUNDING may take all other and further actions and avail itself of any and all rights, powers, remedies and privileges available to FLEXIBLE FUNDING under this Agreement, der any other agreement document or instrument executed and/or delivered to FLEXIBLE FUNDING in connection herewith, under the UCC or other applicable law, under law or in equity, including but not limited to, taking all steps deemed necessary to effect collection of the *Accounts Receivable* and otherwise dispose of the *Collateral* in accordance with the terms of this Agreement, the UCC and applicable law.

26.    In the absence of the occurrence and continuation of an *Event of Default*, FLEXIBLE FUNDING may terminate its obligations under this Agreement provided it has given written notice to MOWBRAY at least sixty (60) days prior to the effective date of termination, with all *Obligations* payable on the effective date of termination.

27.    Upon payment in full of all *Obligations* to FLEXIBLE FUNDING pursuant to the provisions of paragraphs 24, 25 or 26 above, as applicable, and upon the execution and delivery by MOWBRAY of a General Release to FLEXIBLE FUNDING, in form and content reasonably satisfactory to FLEXIBLE FUNDING, this Agreement shall be deemed terminated.

27.1    This Agreement and the security interests hereby granted shall remain in effect until such time as all *Obligations* have been paid to FLEXIBLE FUNDING and satisfied in full, and FLEXIBLE FUNDING's General Release is executed by MOWBRAY.

27.2    At such time as all *Obligations* shall have been indefeasibly paid and satisfied in full and FLEXIBLE FUNDING'S General Release is executed and delivered to FLEXIBLE FUNDING by MOWBRAY, FLEXIBLE FUNDING will re-assign to MOWBRAY any and all interests it may have in the *Collateral* and will execute such termination statements as MOWBRAY may reasonably request.

## TERMINATION BY MOWBRAY

28.    In the event that:

28.1    FLEXIBLE FUNDING fails to pay to MOWBRAY when due any monies owing to MOWBRAY under this Agreement; or

28.2    FLEXIBLE FUNDING fails to timely perform the services to be rendered by FLEXIBLE FUNDING hereunder;

7

then, MOWBRAY may notify FLEXIBLE FUNDING of its intent to terminate this Agreement, which termination shall become effective only upon the payment to FLEXIBLE FUNDING in cash in full of all *Obligations* payable hereunder. If the *Obligations* are not paid in in cash in full to FLEXIBLE FUNDING within sixty (60) days after delivery of such notice of intent to terminate, then such notice of termination shall be void and ineffective.

29.   In the absence of the occurrence and continuation of an Event of Default MOWBRAY may terminate this Agreement at any time, for any reason, provided it has given written notice to FLEXIBLE FUNDING at least sixty (60) days prior to the effective date of termination and further provided that all *Obligations* payable hereunder shall have been paid in full to FLEXIBLE FUNDING on or prior to the effective date of such termination. Any notice of termination which is not followed by payment of all *Obligations* in full in cash to FLEXIBLE FUNDING within sixty (60) days shall be void and ineffective.

30.   Upon payment in full of all *Obligations* to FLEXIBLE FUNDING pursuant to the provisions of paragraphs 28 or 29 above, as applicable, and in the event of termination of this agreement pursuant to paragraph 29 above upon the execution and delivery by MOWBRAY of a General Release to FLEXIBLE FUNDING, in form and content reasonably satisfactory to FLEXIBLE FUNDING, this Agreement shall be deemed terminated.

30.1   This Agreement and the security interests hereby granted shall remain in effect until such time as all *Obligations* have been paid to FLEXIBLE FUNDING and satisfied in full, and FLEXIBLE FUNDING's General Release is executed by MOWBRAY in the event of termination of this Agreement pursuant to paragraph 29 above.

30.2   At such time as all *Obligations* shall have been indefeasibly paid and satisfied in full, and in the event of termination of this agreement pursuant to paragraph 29 above FLEXIBLE FUNDING'S General Release is executed and delivered to FLEXIBLE FUNDING by MOWBRAY, FLEXIBLE FUNDING will re-assign to MOWBRAY any and all interests it may have in the *Collateral* and will execute such termination statements as MOWBRAY may reasonably request

31.   Upon termination of this Agreement for any reason, FLEXIBLE FUNDING shall render an accounting for all *Accounts Receivable* to MOWBRAY.

## INSURANCE REQUIREMENTS

32.   MOWBRAY shall provide FLEXIBLE FUNDING with proof of employee bonding (if required by its' *Eligible Account Debtors*), workers compensation and liability insurance. MOWBRAY shall notify FLEXIBLE FUNDING of any changes in insurance and shall ensure that FLEXIBLE FUNDING is named on the certificate of insurance list as certificate holder.

## INDEMNIFICATION

33.   MOWBRAY agrees and warrants that under no circumstances are employees of MOWBRAY to be considered employees of FLEXIBLE FUNDING for any purpose, including but not limited to, any state or federal wage and hour law, federal withholding, state withholding, withholding to other taxing authority or health benefits program; employees shall at all times be recognized as the employees of MOWBRAY for all purposes. MOWBRAY shall promptly after each pay period as required, make payments to the Internal Revenue Service for federal taxes; to the State for state taxes; and to any other governmental agency to whom any tax or similar payment obligation is due with respect to employees' activities. MOWBRAY shall cause FLEXIBLE FUNDING to be given promptly suitable evidence of all such payments.

34.   MOWBRAY warrants that all of its employees are legally entitled to be employed in the United States and agrees to defend and hold harmless FLEXIBLE FUNDING, its directors, officers, employees and agents, for any failure on the part of MOWBRAY to comply with relevant immigration, non-discrimination, employment and employee-benefit laws.

35.   Without limiting any other rights hereunder or under applicable law, MOWBRAY hereby agrees to indemnify FLEXIBLE FUNDING and all officers, directors, shareholders, employees and agents thereof ("*FF Indemnitees*"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including attorneys' fees and disbursements awarded against or incurred by any of them relating to: (a) any representation or warranty made by MOWBRAY or any officers or affiliates that was false or misleading when made; (b) MOWBRAY's breach of applicable law, rule or regulation; (c) any imperfection in FLEXIBLE FUNDING's security or ownership interest in any *Collateral* or *Account Receivable* caused by MOWBRAY; (d) any dispute, claim, offset or defense of any obligor, including without limitation, any relating to the goods or services related to such *Accounts Receivable* and products liability claims; and (e) any tax, governmental fee or charge and all interest and penalties thereon except those that *FF Indemnitees* are expected to pay as a result of their normal course of business or that are assessed or incurred as a result of any of such *FF Indemnitee's* failure to comply with any applicable law.

36.   Without limiting any other rights hereunder or under applicable law, FLEXIBLE FUNDING hereby agrees to indemnify MOWBRAY and all officers, directors, shareholders, employees and agents thereof ("*Mowbray's Indemnitees*"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including attorneys' fees and disbursements awarded against or incurred by any of them relating to: (a) any representation or warranty made by FLEXIBLE FUNDING or any officers or affiliates that was false or misleading when made; (b) FLEXIBLE FUNDING's breach of applicable law, rule or regulation; (c) any claims by an *Eligible Account Debtor* relating to the breach by FLEXIBLE FUNDING of any

8

confidentiality or non-disclosure agreement by and between MOWBRAY and such *Eligible Account Debtor*, and (d) any tax, governmental fee or charge and all interest and penalties thereon except those that *Mowbray's Indemnitees* are expected to pay as a result of their normal course of business or that are assessed or incurred as a result of any of such *Mowbray's Indemnitee's* failure to comply with any applicable law. In connection with any claim by any *Mowbray's Indemnitee* for indemnification by FLEXIBLE FUNDING, FLEXIBLE FUNDING may elect (but is not obligated) to direct the defense thereof; provided, that the selection of counsel shall be subject to MOWBRAY's consent, which consent shall not be unreasonably withheld or delayed, and MOWBRAY shall be entitled to participate in the defense of any matter for which indemnification may be required under this paragraph 36 and to employ counsel at its own expense to assist in the handling of such matter. Any *FF Indemnitee* may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such *FF Indemnitee* or the *Collateral*, subject to MOWBRAY's prior approval of any settlement, which shall not be unreasonably withheld or delayed.

37.   MOWBRAY hereby releases, discharges and agrees to hold harmless and indemnify FLEXIBLE FUNDING's banks from any and all actions, suits, causes of action, claims and demands whatsoever, including reasonable attorneys' fees and costs, which MOWBRAY has, or may have, in the future arising out of the authority MOWBRAY has granted to FLEXIBLE FUNDING to accept, endorse and deposit remittances for MOWBRAY to the FLEXIBLE FUNDING Deposit Accounts.

38.   In no event will FLEXIBLE FUNDING have any liability to any *Mowbray's Indemnitee*, or will MOWBRAY have any liability to any *FF Indemnitee*, for lost profits or other special or consequential damages.

39.   To the extent that a party's undertaking to indemnify any indemnitee pursuant to the provisions of paragraphs 33 through 38, inclusive, may be unenforceable because it violates any law or public policy, such party shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all matters referred to under paragraphs 33 through 38, inclusive.

## WAIVERS

40.   The failure of FLEXIBLE FUNDING or MOWBRAY to enforce any of the terms and provisions of this Agreement, or the failure to exercise any right upon a default thereunder, shall apply only in the particular instance and shall not operate as a continuing waiver of rights. To the maximum extent permitted under applicable law, MOWBRAY hereby irrevocably waives all of the following:

40.1   Any and all rights and remedies now or hereafter conferred by statute or otherwise which may require FLEXIBLE FUNDING to (a) take any judicial proceedings in connection with any of the *Collateral* or otherwise use any of the *Collateral* in mitigation of FLEXIBLE FUNDING's damages as set forth herein, or (b) proceed against any person or entity liable for any obligations as a condition to or prior to proceeding hereunder; and (c) dispose, sell or otherwise realize upon or collect or apply any personal property securing any obligations of MOWBRAY, as a condition to, or prior to proceeding against MOWBRAY hereunder.

## NOTICE

41.   Any Notice, Request or Demand under this Agreement shall be in writing, with proof of receipt, issued via USPS, Fed Ex, UPS or designated email address.

41.1   Any Notice, Request or Demand shall be deemed received and effective on the day on which it is received.

41.2   Notice of any (a) change of address of principal place of business, (b) state of incorporation, (c) legal business name, or (d) Fictitious Business Name (DBA) by either party shall be in writing and mailed not less than ten (10) days prior to any such change.

41.3   Both parties agree to communicate with one another fully and in good faith, particularly about business conditions, changes, concerns and or other matters pertaining to MOWBRAY's business, and each shall inform the other as soon as possible but not later than Five (5) days after any relevant occurrence.

## INSPECTION AND REPORTING

42.   FLEXIBLE FUNDING, through its agents or employees, shall have the right to inspect and audit the books and records of MOWBRAY at all reasonable times without hindrance or delay at FLEXIBLE FUNDING's expense. MOWBRAY shall provide FLEXIBLE FUNDING with copies of its quarterly balance sheet, income statement and Employer's Quarterly Federal Tax Return, Form 941, by the 30th day following the end of each quarter. FLEXIBLE FUNDING may monitor federal tax, state tax, and workers compensation insurance payments MOWBRAY is required to make. MOWBRAY will provide proof of payment and copies of reports when requested.

43.   MOWBRAY shall have the right to inspect and audit the books and records of FLEXIBLE FUNDING pertaining to transactions subject to this Agreement upon reasonable notice to FLEXIBLE FUNDING and during FLEXIBLE FUNDING's normal business hours at MOWBRAY's expense.

## ASSIGNMENT

44.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors or permitted assigns, and may be assigned by FLEXIBLE FUNDING in whole or in part, but shall not be assignable by MOWBRAY without the express, written consent of FLEXIBLE FUNDING.

45.   Any attempted assignment by MOWBRAY of its rights or obligations under this Agreement without the express prior written consent of FLEXIBLE FUNDING shall be void, and any permitted assignment will not excuse MOWBRAY's obligations to FLEXIBLE FUNDING without a full release of such obligations and duties, signed by both parties.  FLEXIBLE FUNDING may still proceed against MOWBRAY on any payment obligation outstanding at the time of assignment until such obligation is indefeasibly fulfilled by MOWBRAY or its assigns.

46.   The parties anticipate that FLEXIBLE FUNDING may assign its rights in the *Collateral* provided under this Agreement and monies receivable by it hereunder to its lender(s).  MOWBRAY agrees to such assignment and that any such assignee shall be a third-party beneficiary of this Agreement.

## SEVERABILITY OF PROVISIONS

47.   Each and every provision of this Agreement shall be severable from every other provision for the purposes of determining legal enforceability of any such provision or provisions.

## DISPUTE RESOLUTION AND JUDICIAL ACTIONS

48.   Any dispute between FLEXIBLE FUNDING and MOWBRAY arising out of or in connection with this Agreement shall be filed in the Superior Court or District Court located in San Francisco, California.

49.   · MOWBRAY agrees to reimburse FLEXIBLE FUNDING, on demand, for:

49.1    The actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which MOWBRAY is a party and FLEXIBLE FUNDING is not;

49.2    Any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against MOWBRAY, including those (a) arising out the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of MOWBRAY's plan thereunder.

50.   In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

51.   This Agreement shall be deemed to have been made in the State of California and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and constructed in accordance with the laws of the State of California, without regard to principles of conflicts of law.

## AUTHORITY AND EFFECTIVENESS

52.   MOWBRAY. is a duly authorized and existing entity in good standing under the laws of the State of **California**. The execution, delivery and performance of this Agreement and the documents contemplated herein are within MOWBRAY's powers, have been duly authorized, and are not in contravention of any law, the terms of any indenture, agreement or undertaking to which MOWBRAY is a party or by which it is bound.

53.   MOWBRAY hereby authorizes, and FLEXIBLE FUNDING hereby agrees to accept, instructions from any personnel issued a login to the FLEXIBLE FUNDING portal.

54.   This Agreement will remain in full force and effect and continue to be effective should: (a) any petition be filed by or against MOWBRAY for liquidation or reorganization; (b) MOWBRAY become insolvent or make an assignment for the benefit of creditors; or (c) a receiver or trustee be appointed for all or any significant part of MOWBRAY's assets.

10

## FLEXIBILITY AND INTREGRATION

55.   FLEXIBLE FUNDING's rights and remedies under this Agreement shall be cumulative and FLEXIBLE FUNDING shall have all other rights and remedies not inconsistent therewith as provided by law. No exercise by FLEXIBLE FUNDING of one right or remedy shall be deemed an election and no waiver by FLEXIBLE FUNDING of any default on MOWBRAY's part shall be deemed a continuing waiver. No delay by FLEXIBLE FUNDING shall constitute a waiver or election.

56.   This Agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof.

## GENERAL PROVISIONS

57.   FLEXIBLE FUNDING's rights, powers, remedies and privileges under this Agreement (specifically including all rights, powers, remedies and privileges of FLEXIBLE FUNDING as a secured party under the UCC) shall be cumulative and not alternative or exclusive, irrespective of any other rights, powers, remedies or privileges that may be available to FLEXIBLE FUNDING under any other agreement, document or instrument between the parties, by operation of law or otherwise, and may be exercised by FLEXIBLE FUNDING at such time or times and in such order as FLEXIBLE FUNDING in FLEXIBLE FUNDING's sole discretion may determine, and are for the sole benefit of FLEXIBLE FUNDING.

58.   FLEXIBLE FUNDING's rights, powers, remedies and privileges under this Agreement and the agreements, covenants, liabilities and obligations of Borrower set forth in this Agreement (including, but not limited to, the final and indefeasible payment to FLEXIBLE FUNDING in cash of all amounts payable to FLEXIBLE FUNDING under this Agreement in full, and all security interests, liens, charges and other encumbrances granted to FLEXIBLE FUNDING under this Agreement) shall continue to be effective, or be reinstated, as the case may be, if at any time (a) any payment in respect of the *Credit Line* or other amount payable to FLEXIBLE FUNDING hereunder or performance hereunder is rescinded or must otherwise be restored or returned by FLEXIBLE FUNDING by reason of any bankruptcy, reorganization, arrangement, composition or similar proceeding, whether as a "voidable preference", "fraudulent conveyance", or otherwise, or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer of, MOWBRAY or any other person, or any property of MOWBRAY or any other person, or otherwise, all as though such payment had not been made or performance completed.

59.   MOWBRAY acknowledges that FLEXIBLE FUNDING does not intend to reserve, charge or collect interest on money borrowed under this Agreement at any rate in excess of the rates permitted by applicable law and that, should a final order determine that any interest rate provided for in this Agreement exceeds such legally permissible rate(s), such rate will automatically be reduced to the maximum rate permitted under applicable law. If FLEXIBLE FUNDING should collect any amount from MOWBRAY which is determined to be interest in a final order, and such amount would result in the interest rate charged hereunder exceeding the maximum rate permitted by applicable law, such amount will be applied to reduce principal of the *Credit Line* or, if no amounts payable to FLEXIBLE FUNDING pursuant to this Agreement remain outstanding, will be refunded to MOWBRAY.

60.   FLEXIBLE FUNDING shall not be responsible for any failure of any advance of the *Credit Line* to be credited to any account of MOWBRAY (i) if such failure is caused by conditions beyond FLEXIBLE FUNDING's control including, but not limited to acts of God, restrictions of governmental entities (including the denial or cancellation of any necessary license, registration or permit), wars, insurrections, or interruptions of telephone service or internet access caused by a service provider or resulting from the failure of a service provider's equipment, software or personnel, and (ii) if such failure is not caused by or due to an event, occurrence or condition described in clause (i) immediately above, unless such failure is caused by or due to FLEXIBLE FUNDING's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment.

61.   This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

11

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement March 11, 2019.

*for* FLEXIBLE FUNDING LTD. LIABILITY CO.

Steve Capper                                              Paul DeLuca

*for* THE ORIGINAL MOWBRAY'S TREE SERVICE INC.

Name: Gloria Mowbray
Title: President

FIRST AMENDMENT

TO THE

ACCOUNTS RECEIVABLE FINANCING AGREEEMENT

BETWEEN

THE ORIGINAL MOWBRAY'S TREE SERVICE INC.

AND

FLEXIBLE FUNDING LTD. LIABILITY CO.

DATED AS OF MARCH 20, 2019

Effective as of June 28, 3019

**FIRST AMENDMENT TO ACCOUNTS RECEIVABLE FINANCING AGREEMENT**

This First Amendment to Accounts Receivable Financing Agreement (this "*Amendment*") is dated as of June 28, 3019 (the "*Effective Date*"), and is by and among **THE ORIGINAL MOWBRAY'S TREE SERVICE INC.,** a California corporation ("*Borrower*"), and **FLEXIBLE FUNDING LTD. LIABILITY CO.,** a California limited liability company ("*Lender*").

**RECITALS:**

Borrower and Lender are parties to a Accounts Receivable Financing Agreement dated as of March 20, 2019, as may have been amended from time to time prior to the date hereof (as so amended, the "*Loan Agreement*"), and other agreements, documents and instruments in connection therewith (all of the foregoing, as the same may be amended, restated, or otherwise modified from time to time, to be collectively referred to as the "*Loan Documents*").

Borrower has requested that Lender provide certain availability for post-petition Eligible Receivables of PG&E in the absence of credit insurance for such receivables. Upon the terms and conditions contained in this Amendment, Lender has agreed to amend the Loan Agreement as provided below.

**AGREEMENT:**

1.  Defined Terms. Unless otherwise defined in the Recitals or in the body of this Amendment, all capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

2.  Borrower Representations. Borrower hereby represents to Lender, that:

    (a)    All Loan Documents executed by Borrower, including without limitation the Loan Agreement, constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with the terms thereof;

    (b)    Borrower has no claims, offsets, counterclaims, or defenses with respect to the payment or performance of any Obligations owing to Lender under any of the Loan Documents;

    (c)    On and as of the Effective Date, and after giving effect to this Amendment, no Default or Event of Default has occurred and is continuing under the terms of the Loan Documents; and

    (d)    As a material inducement to Lender entering into this Amendment, Borrower acknowledges and agrees that Lender is relying on the accuracy and veracity of each of the above representations.

3.  PG&E Subline. Section 11.1 of the Loan Agreement is hereby amended by adding the following sentence to the end thereof:

    "Notwithstanding anything to the contrary contained herein, in determining the Borrowing Base pursuant to the foregoing at any time, in no event shall Eligible Accounts Receivable of PG&E be considered or included to the extent they exceed, individually or in the aggregate, Three Million and 00/100 Dollars ($3,000,000.00) at such time."

4.  Amendment and Credit Risk Fee; Reimbursement of Lender. As consideration for Lender's amendment of the Loan Agreement pursuant to the foregoing, and as consideration for Lender's willingness to lend against PG&E Eligible Accounts from and after the date hereof, Borrower shall (a) pay to Lender an "Amendment Fee" equal to One Hundred Ninety-Eight Thousand and 00/100 Dollars on the date hereof which is fully earned and payable on the Effective Date, and (b)

reimburse, indemnify and hold Lender harmless for the reasonable fees and costs and expenses incurred by Lender for the services of legal professionals engaged by Lender in connection with the negotiation and preparation of this Amendment. With respect to any amount required to be paid or reimbursed by Borrower pursuant to the foregoing provisions of this paragraph 4, it is hereby agreed that Lender may charge any such amount to the Credit Line on the dates such payment is due or such reimbursement is made.

5. Effective Date. This Amendment shall be effective as the Effective Date.

6. Specificity of Provisions. The amendments set forth herein are limited precisely as written and shall not be deemed to (a) be a consent to or a waiver of any other term or condition of the Loan Agreement or any other Loan Document, or (b) prejudice any right or rights which Lender may now have or may have in the future under or in connection with the Loan Agreement or any other Loan Document. From and after the Effective Date of this Amendment, whenever the Loan Agreement is referred to in the Loan Agreement or in any other Loan Document, it shall be deemed to mean the Loan Agreement as modified by this Amendment.

7. Binding Effect of Loan Documents. Borrower hereby acknowledges and agrees that upon giving effect to this Amendment, the Loan Agreement, the Revolving Credit Note and each other Loan Document shall continue to be binding upon such Borrower and shall continue in full force and effect.

8. Release. Borrower, together with its respective parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, "*releasors*") hereby voluntarily and knowingly release and forever waive and discharge Lender and its parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, attorneys, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, the "*released parties*") from all possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, or at law or in equity, in any case originating in whole or in part on or before the date hereof that any of the releasors may now or hereafter have against the released parties (or any of them), if any, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, including without limitation arising directly or indirectly from the loan agreement, the loan documents, the exercise of any rights and remedies under the loan documents and/or negotiation for and execution of this amendment or the loan documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable. Each of the releasors waives the benefits of any law, which may provide in substance: "a general release does not extend to claims which the creditor does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the debtor." Each of the releasors understands that the facts which it believes to be true at the time of making the release provided for herein may later turn out to be different than it now believes, and that information which is not now known or suspected may later be discovered. Each of the releasors accepts this possibility, and each of them assumes the risk of the facts turning out to be different and new information being discovered; and each of them further agrees that the release provided for herein shall in all respects continue to be effective and not subject to termination or rescission because of any difference in such facts or any new information.

Releasors agree that (i) the commencement of any litigation or legal proceedings by any releasor or any of their respective affiliates against any released party with respect to any claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities released hereby, purported to be released hereby or arising on or before the date hereof, and/or (ii) the commencement of any claim, initiation or commencement of any claim or proceeding in favor of, through or by any releasor which alleges that the release herein is invalid or unenforceable in any respect, shall, in each case, constitute an immediate event of default.

9.    Choice of Law.  This Amendment and the legal relations among the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles.

10. Counterparts.  This Amendment may be executed by one or more the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective duly authorized officers.

**LENDER:**

FLEXIBLE FUNDING LTD. LIABILITY CO.

By:_____

Name:_____

Its:_____

**BORROWER:**

THE ORIGINAL MOWBRAY'S TREE SERVICE INC.

By:_____

Name:_____

Its:_____

**REAFFIRMATION:**

The undersigned "Guarantor" has executed and delivered an Unconditional Guaranty dated March 20, 2019 in favor of Lender, as may have been, or in the future may be, amended, restated, extended, or otherwise modified from time to time (the "Guaranty"), pursuant to which such Guarantor has agreed to guarantee Borrower's obligations to pay and perform all obligations to Lender and such other matters as described in the Guaranty.

The Guarantor has read the terms of the First Amendment to Accounts Receivable Financing Agreement, above (the "Amendment"). Notwithstanding anything to the contrary contained in the Amendment or the Guaranty, Guarantor hereby (a) reaffirms to Lender and ratifies its obligations under the Guaranty, and each other agreement, document and instrument executed and/or delivered by the Guarantor in connection therewith, as the same may have been amended, extended, restated or otherwise modified from time to time (collectively, the "Guaranty Documents"), and (b) further ratifies and confirms that each of the Guaranty Documents executed and/or delivered to Lender shall remain in full force and effect and constitute valid and binding obligations of such Guarantor, enforceable in accordance with its terms, from and after the "Effective Date" described in the Amendment.

**GUARANTOR:**

Gloria Mowbray

Dated: June 28, 2019

SECOND AMENDMENT

TO THE

ACCOUNTS RECEIVABLE FINANCING AGREEEMENT

BETWEEN

THE ORIGINAL MOWBRAY'S TREE SERVICE INC.

AND

FLEXIBLE FUNDING LTD. LIABILITY CO.

DATED AS OF MARCH 20, 2019

Effective as of February 19, 2020

## SECOND AMENDMENT TO ACCOUNTS RECEIVABLE FINANCING AGREEMENT

This Second Amendment to Accounts Receivable Financing Agreement (this "*Amendment*") is dated as of February 19, 2020 (the "*Effective Date*"), and is by and among **THE ORIGINAL MOWBRAY'S TREE SERVICE INC.**, a California corporation ("*Borrower*"), and **FLEXIBLE FUNDING LTD. LIABILITY CO.**, a California limited liability company ("*Lender*").

### RECITALS:

Borrower and Lender are parties to a Accounts Receivable Financing Agreement dated as of March 20, 2019, as amended by a First Amendment effective as of June 28, 2019, and as may have been amended, restated, extended or otherwise modified from time to time prior to the date hereof (as so amended, restated, extended or otherwise modified, the "*Loan Agreement*"), and other agreements, documents and instruments in connection therewith (all of the foregoing, as the same may be amended, restated, or otherwise modified from time to time, to be collectively referred to as the "*Loan Documents*").

Borrower has requested that Lender increase availability for post-petition Eligible Receivables of PG&E in the absence of credit insurance for such receivables, to extended the termination date of the Loan Agreement, and to make such other changes to the Loan Agreement as described herein. Upon the terms and conditions contained in this Amendment, Lender has agreed to amend the Loan Agreement as provided below.

### AGREEMENT:

1. <u>Defined Terms.</u> Unless otherwise defined in the Recitals or in the body of this Amendment, all capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

2. <u>Borrower Representations.</u> Borrower hereby represents to Lender, that:

    (a)    All Loan Documents executed by Borrower, including without limitation the Loan Agreement, constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with the terms thereof;

    (b)    Borrower has no claims, offsets, counterclaims, or defenses with respect to the payment or performance of any Obligations owing to Lender under any of the Loan Documents;

    (c)    On and as of the Effective Date, and after giving effect to this Amendment, no Default or Event of Default has occurred and is continuing under the terms of the Loan Documents; and

    (d)    As a material inducement to Lender entering into this Amendment, Borrower acknowledges and agrees that Lender is relying on the accuracy and veracity of each of the above representations.

3. <u>PG&E Subline.</u> The last sentence of Section 11.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

    "Notwithstanding anything to the contrary contained herein, in determining the Borrowing Base pursuant to the foregoing at any time, in no event shall Eligible Accounts Receivable of PG&E be considered or included to the extent they exceed, individually or in the aggregate, Eight Million and 00/100 Dollars ($8,000,000.00) at such time."

4. <u>Termination Date.</u> Section 24 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

    "24.    Unless earlier terminated pursuant to the terms of this Agreement, this Agreement shall terminate on March 31, 2021 (the "Termination Date"). On the Termination Date MOWBRAY shall pay to FLEXIBLE FUNDING in cash the entire outstanding principal balance of the Credit Line, plus

all accrued and unpaid interest thereon (whether calculated at the Ordinary Rate or at the Default Rate), plus all fees, costs, expenses and other amounts payable to Lender in connection with the Credit Line, plus all other amounts payable to Lender pursuant to the terms of this Agreement. FLEXIBLE FUNDING shall not be obligated to make or continue to extend any advance of the Credit Line or continue any loan to MOWBRAY under the Credit Line after the Termination Date.

5.   Events of Default.  The term "der" contained in the last paragraph of Section 25 of the Loan Agreement is hereby deleted in its entirety and replaced with "under".

6.   Assignment.  Section 44 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"This Agreement is entered into for the benefit of the parties hereto and their successors and assigns and shall be binding upon the parties, their successors and assigns. FLEXIBLE FUNDING shall have the right, without the necessity of any consent, authorization or other action by MOWBRAY, to sell, hypothecate, assign, securitize or grant participations in all or a portion of FLEXIBLE FUNDING's interests in the advances of the Credit Line, loans made available to MOWBRAY hereunder, this Agreement and/or any other agreements, documents or instruments executed and/or delivered to FLEXIBLE FUNDING in connection with the transactions contemplated by this Agreement, and all or any portion of FLEXIBLE FUNDING's rights, title, interests, powers, remedies, privileges, duties or obligations under this Agreement or any other such agreement, document or instrument, to other financial institutions or other persons of FLEXIBLE FUNDING's choice and on such terms as are acceptable to FLEXIBLE FUNDING in FLEXIBLE FUNDING's sole discretion. MOWBRAY shall not assign, exchange or otherwise hypothecate this Agreement, and any other agreement, document or instrument executed and/or delivered to FLEXIBLE FUNDING in connection with the transactions contemplated by this Agreement, or any rights, liabilities or obligations under this Agreement or any such agreement, document or instrument, in whole or in part, without the prior written consent of FLEXIBLE FUNDING, which consent may be granted or withheld in FLEXIBLE FUNDING's sole discretion, and any attempted assignment, exchange or hypothecation without FLEXIBLE FUNDING's prior written consent shall be void and be of no effect."

7.   Reimbursement of Lender.  As consideration for Lender's amendment of the Loan Agreement pursuant to the foregoing, borrower shall reimburse, indemnify and hold Lender harmless for the reasonable fees and costs and expenses incurred by Lender for the services of legal professionals engaged by Lender in connection with the negotiation and preparation of this Amendment. With respect to any amount required to be paid or reimbursed by Borrower pursuant to the foregoing provisions of this paragraph 7, it is hereby agreed that Lender may charge any such amount to the Credit Line on the dates such payment is due or such reimbursement is made.

8.   Effective Date.  This Amendment shall be effective as the Effective Date.

9.   Specificity of Provisions.  The amendments set forth herein are limited precisely as written and shall not be deemed to (a) be a consent to or a waiver of any other term or condition of the Loan Agreement or any other Loan Document, or (b) prejudice any right or rights which Lender may now have or may have in the future under or in connection with the Loan Agreement or any other Loan Document. From and after the Effective Date of this Amendment, whenever the Loan Agreement is referred to in the Loan Agreement or in any other Loan Document, it shall be deemed to mean the Loan Agreement as modified by this Amendment.

10. Binding Effect of Loan Documents. Borrower hereby acknowledges and agrees that upon giving effect to this Amendment, the Loan Agreement and each other Loan Document shall continue to be binding upon such Borrower and shall continue in full force and effect.

11. Release. Borrower, together with its respective parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, "*releasors*") hereby voluntarily and knowingly release and forever waive and discharge Lender and its parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, attorneys, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, the "*released parties*") from all possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, or at law or in equity, in any case originating in whole or in part on or before the date hereof that any of the releasors may now or hereafter have against the released parties (or any of them), if any, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, including without limitation arising directly or indirectly from the loan agreement, the loan documents, the exercise of any rights and remedies under the loan documents and/or negotiation for and execution of this amendment or the loan documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable. Each of the releasors waives the benefits of any law, which may provide in substance: "a general release does not extend to claims which the creditor does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the debtor." Each of the releasors understands that the facts which it believes to be true at the time of making the release provided for herein may later turn out to be different than it now believes, and that information which is not now known or suspected may later be discovered. Each of the releasors accepts this possibility, and each of them assumes the risk of the facts turning out to be different and new information being discovered; and each of them further agrees that the release provided for herein shall in all respects continue to be effective and not subject to termination or rescission because of any difference in such facts or any new information. Releasors agree that (i) the commencement of any litigation or legal proceedings by any releasor or any of their respective affiliates against any released party with respect to any claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities released hereby, purported to be released hereby or arising on or before the date hereof, and/or (ii) the commencement of any claim, initiation or commencement of any claim or proceeding in favor of, through or by any releasor which alleges that the release herein is invalid or unenforceable in any respect, shall, in each case, constitute an immediate event of default.

12. Choice of Law. This Amendment and the legal relations among the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles.

13. Counterparts. This Amendment may be executed by one or more the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective duly authorized officers.

**LENDER:**

FLEXIBLE FUNDING LTD. LIABILITY CO.

By: _____

Name: Paul DeLuca

Its: Managing Member

**BORROWER:**

THE ORIGINAL MOWBRAY'S TREE SERVICE INC.

By: _____

Name: Gloria Mowbray

Its: President

**REAFFIRMATION:**

The undersigned "Guarantor" has executed and delivered an Unconditional Guaranty dated March 20, 2019 in favor of Lender, as may have been, or in the future may be, amended, restated, extended, or otherwise modified from time to time (the "*Guaranty*"), pursuant to which such Guarantor has agreed to guarantee Borrower's obligations to pay and perform all obligations to Lender and such other matters as described in the Guaranty.

The Guarantor has read the terms of the Second Amendment to Accounts Receivable Financing Agreement, above (the "*Amendment*"). Notwithstanding anything to the contrary contained in the Amendment or the Guaranty, Guarantor hereby (a) reaffirms to Lender and ratifies its obligations under the Guaranty, and each other agreement, document and instrument executed and/or delivered by the Guarantor in connection therewith, as the same may have been amended, extended, restated or otherwise modified from time to time (collectively, the "*Guaranty Documents*"), and (b) further ratifies and confirms that each of the Guaranty Documents executed and/or delivered to Lender shall remain in full force and effect and constitute valid and binding obligations of such Guarantor, enforceable in accordance with its terms, from and after the "Effective Date" described in the Amendment.

**GUARANTOR:**

_____

Gloria Mowbray

Dated: February 19, 2020

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of _San Bernardino_____ }

On _February 19,2020_ before me, _Lilliana Perez-Vegar_____,
(Here insert name and title of the officer)

personally appeared _Gloria Mowbray_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature              (Notary Public Seal)

LILLIANA PEREZ-VEGAR
Commission No. 2241544
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires      MAY 7. 2022

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

_Second Amendment_
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _4_ Document Date_2/19/2020_

CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

2015 Version www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
  ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**THIRD AMENDMENT**

**TO THE**

**ACCOUNTS RECEIVABLE FINANCING AGREEEMENT**

**BETWEEN**

**THE ORIGINAL MOWBRAY'S TREE SERVICE, INCORPORATED**

**AND**

**FLEXIBLE FUNDING LTD. LIABILITY CO.**

**DATED AS OF MARCH 20, 2019**

Effective as of March 6, 2020

## THIRD AMENDMENT TO ACCOUNTS RECEIVABLE FINANCING AGREEMENT

This Third Amendment to Accounts Receivable Financing Agreement (this "*Amendment*") is dated as of March 6, 2020 (the "*Effective Date*"), and is by and among **THE ORIGINAL MOWBRAY'S TREE SERVICE, INCORPORATED**, a California corporation ("*Borrower*"), and **FLEXIBLE FUNDING LTD. LIABILITY CO.**, a California limited liability company ("*Lender*").

**RECITALS:**

Borrower and Lender are parties to a Accounts Receivable Financing Agreement dated as of March 20, 2019, as amended by a First Amendment effective as of June 28, 2019, by a Second Amendment effective as of February 19, 2020, and as may have been amended, restated, extended or otherwise modified from time to time prior to the date hereof (as so amended, restated, extended or otherwise modified, the "*Loan Agreement*"), and other agreements, documents and instruments in connection therewith (all of the foregoing, as the same may be amended, restated, or otherwise modified from time to time, to be collectively referred to as the "*Loan Documents*").

Borrower has requested that Lender increase the credit limit available to Borrower, increase availability for post-petition Eligible Receivables of PG&E in the absence of credit insurance for such receivables, to extend the termination date of the Loan Agreement, and to make such other changes to the Loan Agreement as described herein. Upon the terms and conditions contained in this Amendment, Lender has agreed to amend the Loan Agreement as provided below.

**AGREEMENT:**

1.  <u>Defined Terms.</u>  Unless otherwise defined in the Recitals or in the body of this Amendment, all capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

2.  <u>Borrower Representations.</u>  Borrower hereby represents to Lender, that:

      (a)  All Loan Documents executed by Borrower, including without limitation the Loan Agreement, constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with the terms thereof;

      (b)  Borrower has no claims, offsets, counterclaims, or defenses with respect to the payment or performance of any Obligations owing to Lender under any of the Loan Documents;

      (c)  On and as of the Effective Date, and after giving effect to this Amendment, no Default or Event of Default has occurred and is continuing under the terms of the Loan Documents; and

      (d)  As a material inducement to Lender entering into this Amendment, Borrower acknowledges and agrees that Lender is relying on the accuracy and veracity of each of the above representations.

3.  <u>Identification of Borrower.</u>  The reference to "THE ORIGINAL MOWBRAY'S TREE SERVICE INC." contained in the first recital contained in the Loan Agreement is hereby deleted and replaced with "THE ORIGINAL MOWBRAY'S TREE SERVICE, INCORPORATED".  Borrower acknowledges and agrees that (a) all references to "MOWBRAY" contained in the Loan Agreement were at all times intended to, and do, refer to The Original Mowbray's Tree Service, Incorporated., notwithstanding the mis-identification of Borrower's corporate name, and that (b) that Borrower was, on and after March 20, 2019, and continues to be, bound by the terms and conditions of the Loan Agreement and the other Loan Documents, including but not limited to, Borrower's liability and obligations to repay the Obligations and the grant to Lender of the security interests in Collateral as provided by the terms of the Loan Agreement.

4.  <u>PG&E Subline.</u>  The last sentence of Section 11.1 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"Notwithstanding anything to the contrary contained herein, in determining the *Borrowing Base* pursuant to the foregoing at any time, in no event shall *Eligible Accounts Receivable* of *PG&E* be considered or included to the extent they exceed, individually or in the aggregate, Twelve Million and 00/100 Dollars ($12,000,000.00) at such time."

5.  <u>Increase of Credit Limit.</u>  Paragraph 11.2 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"11.2  In no event shall the outstanding principal balance of the *Credit Line* at any time exceed, without FLEXIBLE FUNDING's prior written approval, which approval may be granted or withheld in FLEXIBLE FUNDING's sole discretion, **$14,000,000.00** (Fourteen Million and 00/100 Dollars) (the "*Limit*").

11.2.1   <u>Increase in the *Limit*.</u>  MOWBRAY may, at any time and from time to time, upon prior written notice by MOWBRAY to FLEXIBLE FUNDING, request to increase the *Limit* with an additional commitment from FLEXIBLE FUNDING (a "*Flexible Commitment Increase*"), or from one or more new commitments from any other person selected by FLEXIBLE FUNDING to participate in the *Credit Line*, to make an independent commitment as a lender under this Agreement and the other, agreements, documents and instruments executed and/or delivered to FLEXIBLE FUNDING in connection with the transactions contemplated by this Agreement, or as otherwise determined by FLEXIBLE FUNDING in its sole discretion (each such commitment from a Person other than FLEXIBLE FUNDING, a "*Third-Party Commitment*"), <u>provided that:</u>

11.2.1.1   the aggregate principal amount of all increases of the *Limit* pursuant to this paragraph 11.2.1 shall not exceed the lesser of (A) Eleven Million Dollars ($11,000,000.00), and (B) the aggregate amount of any *Flexible Commitment Increase* approved by FLEXIBLE FUNDING in its sole discretion and *Third-Party Commitments* obtained by FLEXIBLE FUNDING;

11.2.1.2   FLEXIBLE FUNDING, in its sole discretion, shall have approved such proposed increase of the *Limit*;

11.2.1.3   no *Event of Default* shall exist before and immediately after giving effect to such increase of the *Limit*;

11.2.1.4   any person providing a *Third-Party Commitment* in connection with any increase of the *Limit* shall execute and deliver to FLEXIBLE FUNDING a participation agreement and related documents, a joinder agreement and related documents, or such other agreements, documents and instruments reasonably required by FLEXIBLE FUNDING to evidence such person's agreement to make such *Third-Party Commitment*, upon terms and conditions acceptable to FLEXIBLE FUNDING in its sole discretion;

11.2.1.5   any such increase of the *Limit* shall be subject to receipt by FLEXIBLE FUNDING of a certificate of MOWBRAY dated as of the date of such increase signed by an authorized officer of MOWBRAY (x) certifying and attaching the resolutions adopted by MOWBRAY and each guarantor of MOWBRAY's obligations to FLEXIBLE FUNDING approving or consenting to such increase, and (y) certifying that, before and after giving effect to such increase, the representations and warranties of MOWBRAY contained in this Agreement and of such guarantor(s) contained in each agreement, document and instrument executed and/or delivered to FLEXIBLE FUNDING by such guarantor are true and correct in all material respects

on and as of the date of such increase, except to the extent that such representations and warranties specifically refer to an earlier date; and

      11.2.1.6 all costs, fees and expenses of FLEXIBLE FUNDING and each person providing a *Third-Party Commitment* (including, for the avoidance of doubt, all fees, costs and expenses of counsel to FLEXIBLE FUNDING and each such person) in connection with such increase in the *Limit* shall have been paid by MOWBRAY prior to the effective date of such increase.

From and after the date of any increase of the *Limit* described in this paragraph 11.2, for purposes of this Agreement the "*Limit*" shall mean the *Limit* as so increased. In the event that the outstanding principal balance owing on the *Credit Line* under this Agreement exceeds the lesser of the *Limit* or *Borrowing Base*, as determined by FLEXIBLE FUNDING, MOWBRAY understands and agrees that there shall be no further advances on the *Credit Line* to the undersigned unless and until MOWBRAY pays the amount of such excess (the "*Over Advance*"), and MOWBRAY hereby promises to pay any *Over Advance* upon demand of FLEXIBLE FUNDING."

6. <u>Unused Line Fee.</u> Paragraph 12.2 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"12.2 Monthly an *Unused Line Fee* at a rate equal to one and one-half percent (1.50%) *per annum*, applied to the amount by which the *Limit* exceeds the average daily principal balance of the outstanding *Credit Line* during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any of the *Obligations* are outstanding, which fee shall be payable in arrears on April 1, 2020, on the first (1st) day of each calendar month thereafter until all *Obligations* have been finally paid in cash to FLEXIBLE FUNDING and satisfied in full, and on the *Termination Date* (if this Agreement has not been earlier terminated pursuant to the terms contained herein)."

7. <u>Annual Fee.</u> A new paragraph 12.5 is hereby added to the Loan Agreement to read as follows:

"12.5 An annual fee in an amount equal to one and one-half percent (1.50%) of the *Limit* (the "*Annual Fee*"), payable annually in advance commencing on March 31, 2021 (the "*Anniversary Date*") and on each anniversary of the Anniversary Date thereafter and continuing until such time as (y) all *Obligations* shall have been finally repaid in cash to FLEXIBLE FUNDING and satisfied in full, and (z) this Agreement shall have been terminated. The *Annual Fee* shall be earned in full on each *Anniversary Date*, and the *Annual Fee* shall be appropriately adjusted upon the date of each increase of the *Limit* pursuant to paragraph 11.2 of this Agreement."

8. <u>Commitment/Closing Fee.</u> A new paragraph 12.5 is hereby added to the Loan Agreement to read as follows:

"12.5 On March 6, 2020, a fee equal to one and one-half percent (1.50%) of the increase of the *Limit* pursuant to the terms the Third Amendment to Accounts Receivable Financing Agreement dated March 6, 2020 and executed by FLEXIBLE FUNDING and MOWBRAY, and upon the date of each increase of the *Limit* pursuant to paragraph 11.2 of this Agreement, a fee equal to one and one-half percent (1.50%) of the amount of such increase (each such fee, a "*Commitment/Closing Fee*")."

9. <u>Termination Date.</u> Paragraph 24 of the Loan Agreement is hereby amended by deleting the reference to "March 31, 2021" contained therein, and by replacing such reference with "March 31, 2023".

10. <u>Reimbursement of Lender.</u> As consideration for Lender's amendment of the Loan Agreement pursuant to the foregoing, Borrower shall (a) pay to Lender an amendment fee equal to Fifty Thousand and 00/100 Dollars ($50,000.00) on the Effective Date, and (b) reimburse, indemnify and hold Lender harmless for the reasonable fees and costs and expenses incurred by Lender for the services of legal

professionals engaged by Lender in connection with the negotiation and preparation of this Amendment. With respect to any amount required to be paid or reimbursed by Borrower pursuant to the foregoing provisions of this paragraph 10, it is hereby agreed that Lender may charge any such amount to the Credit Line on the dates such payment is due or such reimbursement is made.

11. Effective Date of this Amendment. This Amendment shall be effective as of the Effective Date.

12. Specificity of Provisions. The amendments set forth herein are limited precisely as written and shall not be deemed to (a) be a consent to or a waiver of any other term or condition of the Loan Agreement or any other Loan Document, or (b) prejudice any right or rights which Lender may now have or may have in the future under or in connection with the Loan Agreement or any other Loan Document. From and after the Effective Date of this Amendment, whenever the Loan Agreement is referred to in the Loan Agreement or in any other Loan Document, it shall be deemed to mean the Loan Agreement as modified by this Amendment.

13. Binding Effect of Loan Documents. Borrower hereby acknowledges and agrees that upon giving effect to this Amendment, the Loan Agreement and each other Loan Document shall continue to be binding upon such Borrower and shall continue in full force and effect.

14. Release. Borrower, together with its respective parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, "*releasors*") hereby voluntarily and knowingly release and forever waive and discharge Lender and its parents, divisions, subsidiaries, affiliates, members, managers, participants, predecessors, successors, and assigns, and each of its current and former directors, officers, shareholders, members, managers, partners, attorneys, agents, and employees, and each of their respective predecessors, successors, heirs, and assigns (individually and collectively, the "*released parties*") from all possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, or at law or in equity, in any case originating in whole or in part on or before the date hereof that any of the releasors may now or hereafter have against the released parties (or any of them), if any, irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, including without limitation arising directly or indirectly from the loan agreement, the loan documents, the exercise of any rights and remedies under the loan documents and/or negotiation for and execution of this amendment or the loan documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable. Each of the releasors waives the benefits of any law, which may provide in substance: "a general release does not extend to claims which the creditor does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the debtor." Each of the releasors understands that the facts which it believes to be true at the time of making the release provided for herein may later turn out to be different than it now believes, and that information which is not now known or suspected may later be discovered. Each of the releasors accepts this possibility, and each of them assumes the risk of the facts turning out to be different and new information being discovered; and each of them further agrees that the release provided for herein shall in all respects continue to be effective and not subject to termination or rescission because of any difference in such facts or any new information. Releasors agree that (i) the commencement of any litigation or legal proceedings by any releasor or any of their respective affiliates against any released party with respect to any claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liabilities released hereby, purported to be released hereby or arising on or before the date hereof, and/or (ii) the commencement of any claim, initiation or commencement of any claim or proceeding in favor of, through or by any releasor which alleges that the release herein is invalid or unenforceable in any respect, shall, in each case, constitute an immediate event of default.

15. <u>Choice of Law.</u>  This Amendment and the legal relations among the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles.

16. <u>Counterparts.</u>  This Amendment may be executed by one or more the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*
*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective duly authorized officers.

**LENDER:**

FLEXIBLE FUNDING LTD. LIABILITY CO.

By:_____

Name:_____

Its:_____

**BORROWER:**

THE ORIGINAL MOWBRAY'S TREE SERVICE, INCORPORATED

By: _____

Name: _____

Its: _____

**REAFFIRMATION:**

The undersigned "Guarantor" has executed and delivered an Unconditional Guaranty dated March 20, 2019 in favor of Lender, as may have been, or in the future may be, amended, restated, extended, or otherwise modified from time to time (the "*Guaranty*"), pursuant to which such Guarantor has agreed to guarantee Borrower's obligations to pay and perform all obligations to Lender and such other matters as described in the Guaranty.

The Guarantor has read the terms of the Third Amendment to Accounts Receivable Financing Agreement, above (the "*Amendment*"). Notwithstanding anything to the contrary contained in the Amendment or the Guaranty, Guarantor hereby (a) reaffirms to Lender and ratifies its obligations under the Guaranty, and each other agreement, document and instrument executed and/or delivered by the Guarantor in connection therewith, as the same may have been amended, extended, restated or otherwise modified from time to time (collectively, the "*Guaranty Documents*"), and (b) further ratifies and confirms that each of the Guaranty Documents executed and/or delivered to Lender shall remain in full force and effect and constitute valid and binding obligations of such Guarantor, enforceable in accordance with its terms, from and after the "Effective Date" described in the Amendment.

**GUARANTOR:**

_____

Gloria Mowbray

Dated: March 6, 2020

# EXHIBIT B

# AMENDED AND RESTATED ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This **AMENDED AND RESTATED ACCOUNTS RECEIVABLE PURCHASE AGREEMENT** (this "*Agreement*") is dated as of August 8, 2019, but shall be effective as of July 22, 2019 (the "*Effective Date*"), by and between **FLEXIBLE FUNDING LTD. LIABILITY CO.**, a California limited liability company ("FLEXIBLE FUNDING"), with offices at One Embarcadero Center, Suite 1510, San Francisco, California 94111, and **GRAHAM COUNTY LAND COMPANY, L.L.C.**, a North Carolina limited liability company ( "GRAHAM COUNTY LAND COMPANY"), with offices at 750 Tallulah Road, Robbinsville, North Carolina 28711.

## RECITALS:

Pursuant to an Assignment and Consent Agreement dated July 22, 2019 between FIRST BANK & TRUST, dba "FirstLine Funding Group" (*"FirstLine"*), GRAHAM COUNTY LAND COMPANY and FLEXIBLE FUNDING, and the other agreements, documents and instruments executed and/or delivered in connection therewith (the "*Assignment Documents*"), *FirstLine* has assigned, and FLEXIBLE FUNDING has assumed, the factoring and security agreement dated May 24, 2017 between *FirstLine* and GRAHAM COUNTY LAND COMPANY (the "*Original Factoring Agreement*").

Pursuant to the terms of this Agreement FLEXIBLE FUNDING hereby agrees to amend and restate the *Original Factoring Agreement* in its entirety to, among other things, amend and revise the terms of the factoring facility in favor of GRAHAM COUNTY LAND COMPANY (as so amended and revised pursuant to the terms of this Agreement, the "*Factoring Facility*"), in connection with which FLEXIBLE FUNDING may purchase certain present and future *Accounts* that may result from services and sales provided by GRAHAM COUNTY LAND COMPANY ("*Accounts Receivable*") to GRAHAM COUNTY LAND COMPANY's customers (each, an "*Account Debtor*"), and to provide certain services to and for the benefit of GRAHAM COUNTY LAND COMPANY as more fully set forth and specified in this Agreement, including the administration of the *Accounts Receivable* of GRAHAM COUNTY LAND COMPANY as provided herein. This Agreement constitutes the sole understanding between the parties and modification may only be made by a written amendment executed by both parties.

## AGREEMENT:

## GOVERNING LAW; DEFINITIONS

1.    The laws of the State of California and the California Commercial Code shall govern the construction of this Agreement and the rights and duties of the parties hereunder, without reference to or application of any conflicts of laws principles that would apply the laws of any other jurisdiction. All capitalized terms contained herein shall have the meanings ascribed to such terms in the Recitals, above, in the body of this Agreement, in this paragraph 1, or if not defined in any of the foregoing, the meanings set forth in the Uniform Commercial Code adopted in the State of California ("*UCC*").

1.1    "*Advance*" means a payment of proceeds of the *Initial Purchase Payment* for any *Purchased Receivable* remitted by FLEXIBLE FUNDING to GRAHAM COUNTY LAND COMPANY pursuant to the provisions of this Agreement.

1.2    "*Collateral*" has the meaning ascribed to such term in paragraph 18 below.

1.3    "*Disputed Account*" means any *Account Receivable* that is subject to any claim by an *Account Debtor* against GRAHAM COUNTY LAND COMPANY, of any kind whatsoever, valid or invalid, that may reduce the amount collectible from such *Account Debtor* by FLEXIBLE FUNDING in respect of any *Purchased Receivable*, including any dispute or claim, *bona fide* or otherwise, as to price, terms, quantity, quality, delivery, or any cause or defense to payment of an *Account Receivable* whatsoever, and shall also include any *Account Receivable* that has not been approved by the *Account Debtor* within thirty (30) days from the date of the invoice upon which the *Account Receivable* is based, unless FLEXIBLE FUNDING is advised in writing by GRAHAM COUNTY LAND COMPANY to the contrary.  FLEXIBLE FUNDING shall be under no obligation to determine or verify the *bona fides* or veracity of any claim, dispute or other allegation of an *Account Debtor* or GRAHAM COUNTY LAND COMPANY with respect to a *Disputed Account*.

1.4    "*Eligible Receivable*" shall mean each *Account Receivable* that is: (1) not over **90 days** unpaid; (2) not a *Disputed Account* or otherwise subject to any counterclaim, defense, dispute, right of setoff or recoupment by the *Account Debtor* or any other person; (3) not payable by an affiliate of GRAHAM COUNTY LAND COMPANY; (4) not subject to any lien, security interest or other encumbrance other than in favor of FLEXIBLE FUNDING; (5) not subject to assignment or transfer in favor of any person other than to FLEXIBLE FUNDING; (6) not payable by an *Account Debtor* that is insolvent, that has declared bankruptcy, that is subject to an involuntary bankruptcy proceeding, or that has commenced any proceeding under any federal, state or local law relating to liquidation, receivership, insolvency, reorganization, or otherwise affecting the rights of creditors generally; and (7) not disqualified by FLEXIBLE FUNDING for credit or other reason(s) in FLEXIBLE FUNDING's sole discretion.

1.5 *"General Release"* means a release, in form and content acceptable to FLEXIBLE FUNDING, pursuant to which GRAHAM COUNTY LAND COMPANY releases all claims, actions and causes of action against FLEXIBLE FUNDING, known or unknown, and deliverable in connection with the termination of this Agreement.

1.6 *"Initial Purchase Payment"* means an amount equal to **85%** of the net face amount of the invoice representing a *Purchased Receivable*.

1.7 *"Purchase Price"* for each Purchased Receivable means a sum equal to (a) the Initial Purchase Payment for such Purchased Receivable, plus (b) the Subsequent Purchase Payment for such Purchased Receivable.

1.8 *"Obligations"* means all present and future obligations owing by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING whether or not for the payment of money, including but not limited to the outstanding amount of all *Advances* hereunder, all fees, costs and expenses payable by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING pursuant to the terms hereof, and all other amounts payable by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING in connection herewith, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original, renewed, or extended, whether arising before, during, or after the commencement of any bankruptcy case in which GRAHAM COUNTY LAND COMPANY is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

1.9 *"Purchased Receivable"* means each *Eligible Receivable* purchased by FLEXIBLE FUNDING pursuant to the terms of this Agreement.

1.10 *"Reserve Account"* means a bookkeeping account FLEXIBLE FUNDING on the books of FLEXIBLE FUNDING representing an unpaid portion of the *Purchased Receivables*, and which will be applied to the *Obligations* as provided by the terms hereof and maintained by FLEXIBLE FUNDING to ensure GRAHAM COUNTY LAND COMPANY's performance with the provisions hereof.

1.11 *"Subsequent Purchase Payment"* means an amount equal to all collections actually received by FLEXIBLE FUNDING with respect to any *Purchased Receivable* in excess of the *Initial Purchase* Payment thereof, less the amount of all fees, costs and expenses payable by GRAHAM COUNTY LAND COMPANY hereunder applied to such collections, and less all other amounts payable by GRAHAM COUNTY LAND COMPANY hereunder applied to such collections pursuant to the terms of this Agreement. Each *Subsequent Purchase Payment* shall be applied to the outstanding *Obligations* at such times and in such amounts as provided in this Agreement.

## OFFER AND SALE OF ACCOUNTS RECEIVABLE

2. At its election from time to time during the term of this Agreement, GRAHAM COUNTY LAND COMPANY agrees to offer for sale to FLEXIBLE FUNDING certain of its *Eligible Receivables* arising out of sales of goods, or services rendered, by GRAHAM COUNTY LAND COMPANY, and to sell to FLEXIBLE FUNDING on the terms set forth in this Agreement, such of the offered *Eligible Receivables* as FLEXIBLE FUNDING may accept for purchase in accordance with the terms hereof. Pursuant to the terms and conditions hereof, FLEXIBLE FUNDING shall have the absolute right to reject any or all offered *Accounts Receivable*, whether or not an *Eligible Receivable*, and whether or not FLEXIBLE FUNDING has previously purchased any *Account Receivable* of the same *Account Debtor* hereunder.

3. Upon FLEXIBLE FUNDING's purchase of any *Account Receivable* pursuant to the terms hereof, GRAHAM COUNTY LAND COMPANY shall be deemed to have, and shall have, sold, transferred, assigned and otherwise conveyed to FLEXIBLE FUNDING, as a sale by GRAHAM COUNTY LAND COMPANY and a purchase by FLEXIBLE FUNDING, and not as security for any indebtedness or other obligation of GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING, all right, title and interest of GRAHAM COUNTY LAND COMPANY in and to each such *Purchased Receivable*, together with all related rights (but not obligations) of GRAHAM COUNTY LAND COMPANY with respect thereto, including all contract rights, guarantees, letters of credit, liens in favor of GRAHAM COUNTY LAND COMPANY, insurance and other agreements and arrangements of whatever character from time to time supporting or securing payment of such *Purchased Receivable*, and all right, title and interest of GRAHAM COUNTY LAND COMPANY in any related goods, including GRAHAM COUNTY LAND COMPANY's rights and remedies under Article 2, Part 7 of the UCC. The sale, transfer, assignment and conveyance of any *Purchased Receivable* to FLEXIBLE FUNDING does not constitute and is not intended to result in an assumption by FLEXIBLE FUNDING of any obligation of GRAHAM COUNTY LAND COMPANY or any other person in connection with the *Purchased Receivable* or related rights or under any agreement or instrument relating thereto. GRAHAM COUNTY LAND COMPANY agrees to execute and deliver such bills of sale, assignments, letters of credit, notices of assignment, financing statements (including continuation statements) under the UCC and other documents, and make such entries and markings in its books and records, and to take all such other actions (including the negotiation, assignment or transfer of negotiable documents, letters of credit or other instruments) as FLEXIBLE FUNDING may request to further evidence or protect the sales and assignments of *Purchased Receivables* and related rights to FLEXIBLE FUNDING hereunder, as well as FLEXIBLE FUNDING's interest in any goods and inventory returned to GRAHAM COUNTY LAND COMPANY in connection with any *Disputed Account*. After an *Account Receivable* has been purchased by FLEXIBLE FUNDING, GRAHAM COUNTY LAND COMPANY shall not have the right to vary the terms of sale set forth in the invoice relating to such *Purchased Receivable*, or

any other aspect of the *Purchased Receivable*, except in GRAHAM COUNTY LAND COMPANY's capacity as agent for FLEXIBLE FUNDING for purposes of collection of *Purchased Receivable* as may be required by FLEXIBLE FUNDING pursuant to the terms hereof, and then only with the prior written consent of FLEXIBLE FUNDING.

4.     GRAHAM COUNTY LAND COMPANY will provide FLEXIBLE FUNDING with title to all *Purchased Receivables* free and clear of all liens, charges, security interest or deemed trusts, will obtain such discharges or postponements from prior secured creditors as may be necessary to do so, and will ensure that the first use of any *Advance* by FLEXIBLE FUNDING will be to ensure that FLEXIBLE FUNDING receives title to each *Purchased Receivable* free and clear of all liens, charges, security interest or deemed trusts as required under this paragraph 4, including but not limited to paying all outstanding payroll and source deduction related liabilities of GRAHAM COUNTY LAND COMPANY. FLEXIBLE FUNDING may withhold the purchase of any *Eligible Receivable* and/or the *Initial Purchase Payment* of any *Eligible Receivable* until such time as the terms of this paragraph 4 have been complied with.

## ACCOUNTS MANAGEMENT

5.     Before execution of any agreement with an *Account Debtor* in connection with which GRAHAM COUNTY LAND COMPANY desires FLEXIBLE FUNDING to purchase any *Account Receivable* and provide services under this Agreement, GRAHAM COUNTY LAND COMPANY shall provide to FLEXIBLE FUNDING the *Account Debtor's* legal name, address, phone number, and other information that may be requested by FLEXIBLE FUNDING. FLEXIBLE FUNDING may conduct a credit investigation of each *Account Debtor* in FLEXIBLE FUNDING's sole discretion. In addition, FLEXIBLE FUNDING may notify GRAHAM COUNTY LAND COMPANY of such investigation and share information so received. FLEXIBLE FUNDING shall advise GRAHAM COUNTY LAND COMPANY of the acceptance or rejection of each *Account Debtor* submitted for the purchase of *Accounts Receivable*, and may establish a maximum credit limit for such *Account Debtor*, without waiving its right at any subsequent time to terminate or modify any such acceptance.

6.     GRAHAM COUNTY LAND COMPANY shall provide to FLEXIBLE FUNDING each week with the information described below in content and format acceptable to FLEXIBLE FUNDING (hereafter an "*Invoice Pack*"):

6.1     Detail of all outstanding *Accounts Receivable* (which may include, but not limited to, invoices, aging reports, spreadsheets, access to accounting programs, and/or access to certain servicer online portals);

6.2     Supporting information (which may include, but not limited to, signed timecards, timecard data or access, access to online portals identifying timecard information); and

6.3     A listing of all unpaid *Accounts Receivable*.

7.     After submission of an *Invoice Pack*, FLEXIBLE FUNDING shall provide to GRAHAM COUNTY LAND COMPANY a report (each, a "*Facility Report*") that captures the current state of the *Factoring Facility*: *e.g.*, the *Eligible Receivables* included in the most recent *Invoice Pack* purchased by FLEXIBLE FUNDING (in whole or in part), the current *Purchased Receivables* balance; new billings and new collections (since the prior *Invoice Pack*), the then-available amount of the *Factoring Facility*, the current request to purchase *Eligible Receivables* and fees, costs and other expenses payable by GRAHAM COUNTY LAND COMPANY at such time. GRAHAM COUNTY LAND COMPANY agrees that it shall have accepted all entries contained within a *Facilities Report* unless it shall have notified FLEXIBLE FUNDING of any dispute with any of the entries contained in such *Facility Report* within ten (10) days of receipt of such *Facility Report*.

8.     GRAHAM COUNTY LAND COMPANY agrees that all invoices to *Account Debtors* shall designate GRAHAM COUNTY LAND COMPANY as the named payee, with specific remittance instructions as FLEXIBLE FUNDING designates to GRAHAM COUNTY LAND COMPANY from time to time. Currently the designated address for receipt of physical payments (*e.g.*, checks, drafts, *etc.*) is P.O. Box 7064, San Francisco, CA 94120, and instructions for receipt of electronic payments (*e.g.*, wire transfers, ACH's, *etc.*) for the following FLEXIBLE FUNDING account: Bank Name: Wells Fargo Bank • ABA: 121000248 • Account Name: Flexible Funding • Account No: 4428952527 • Phone: 415-391-4320.

9.     The only address on invoices shall be the remittance address and/or electronic remittance address designated in paragraph 8 above. If any payment is received by GRAHAM COUNTY LAND COMPANY, either physically or electronically:

9.1     GRAHAM COUNTY LAND COMPANY shall hold such payment irrevocably in trust for FLEXIBLE FUNDING, separate and apart from GRAHAM COUNTY LAND COMPANY'S own funds;

9.2     GRAHAM COUNTY LAND COMPANY shall deliver such payment within one (1) business day to FLEXIBLE FUNDING in the identical form in which it was received (except for the endorsement or assignment of GRAHAM COUNTY LAND COMPANY where necessary);

9.3     GRAHAM COUNTY LAND COMPANY shall promptly notify the *Account Debtor* in writing to send future payments as set forth in paragraph 8 above.

10.     GRAHAM COUNTY LAND COMPANY shall execute all authorizations or other documents requested to establish and maintain FLEXIBLE FUNDING's authority to accept, endorse and deposit all *Account Debtor* remittances to the bank account of FLEXIBLE FUNDING. GRAHAM COUNTY LAND COMPANY hereby appoints FLEXIBLE FUNDING as its agent for

the purpose of executing all authorizations or other documents to establish and maintain FLEXIBLE FUNDING's authority to accept, endorse and deposit all electronic *Account Debtor* remittances (such as ACH) to the bank account of FLEXIBLE FUNDING.

11. All funds credited to the payment of *Purchased Receivables* and the *Obligations* are conditional upon final payment to FLEXIBLE FUNDING in cash or solvent credits of the items giving rise to such funds. If any item credited to the payment of the *Purchased Receivables* and/or the *Obligations* is not paid to FLEXIBLE FUNDING or payment thereof is rescinded or required to be returned by FLEXIBLE FUNDING, the amount of any credit given for such item shall be charged to the balance of the *Obligations* whether or not the item is returned.

12. Upon request from GRAHAM COUNTY LAND COMPANY entered through FLEXIBLE FUNDING's online portal, FLEXIBLE FUNDING shall forward within one (1) business day to GRAHAM COUNTY LAND COMPANY a report summarizing all then-current transactions in connection with *Factoring Facility*.

**PURCHASE PRICE; LIMIT; COMPENSATION TO FLEXIBLE FUNDING**

13. Subject to the terms of this Agreement, upon receipt of an offer for sale of *Eligible Receivables* from GRAHAM COUNTY LAND COMPANY entered on a business day through FLEXIBLE FUNDING's online portal and the related *Invoice Pack*, subject to the terms of this Agreement FLEXIBLE FUNDING shall, within one (1) business day, remit the aggregate *Initial Purchase Payment* for the *Purchased Receivables* contained in such *Invoice Pack* to such bank account as GRAHAM COUNTY LAND COMPANY shall designate. The amount of the *Initial Purchase Payment* for each *Purchased Receivable* contained in each *Invoice Pack* shall be specified on the *Facility Report*.

13.1 Subject to the application of collections to the *Reserve Account* as provided in paragraph 13.2 below, FLEXIBLE FUNDING shall withdraw each business day funds from collections of *Purchased Receivables* and all other *Collateral* deposited into the account described in paragraph 8 above that are available for withdrawal to the payment of the *Obligations*.

13.2 FLEXIBLE FUNDING shall credit to the *Reserve Account* all collections with respect to a *Purchased Receivable* in excess of the *Initial Purchase Payment* thereof. After the application of available funds to the *Obligations* as provided in paragraph 13.1 above, FLEXIBLE FUNDING shall charge to and deduct from the *Reserve Account* each day the amount of all *Obligations* then owing to FLEXIBLE FUNDING, and in the event that, after the application of available funds to the *Obligations* as provided in paragraph 13.1 above, the *Reserve Account* is less than the amount of the *Obligations* then owing to FLEXIBLE FUNDING, GRAHAM COUNTY LAND COMPANY shall promptly remit to FLEXIBLE FUNDING in cash the amount of such deficiency. To the extent that, application of available funds to the *Obligations* as provided in paragraph 13.1 above and application of the *Reserve Account* to the payment of the *Obligations*, the *Factoring Facility* is in a credit position, the amount remaining in the *Reserve Account* shall be remitted by FLEXIBLE FUNDING to GRAHAM COUNTY LAND COMPANY promptly by wire transfer of immediately available funds to the account designated therefor by GRAHAM COUNTY LAND COMPANY.

13.3 In no event shall the aggregate unpaid *Advances* at any one time exceed, without FLEXIBLE FUNDING's prior written approval, more than **$8,000,000.00** (Eight Million and 00/100 Dollars, the "*Limit*"). At any time the aggregate unpaid portion of *Advances* exceeds the *Limit*, or the aggregate unpaid portion of *Advances* exceeds 85% of the aggregate unpaid value of *Purchased Receivables* at such time, as determined by FLEXIBLE FUNDING, GRAHAM COUNTY LAND COMPANY understands and agrees that there shall be no further Advances on the *Factoring Facility* to the undersigned unless and until GRAHAM COUNTY LAND COMPANY pays the amount of such excess (the "*Over Advance*"), and GRAHAM COUNTY LAND COMPANY hereby promises to pay any *Over Advance* upon demand of FLEXIBLE FUNDING.

13.4 FLEXIBLE FUNDING will have immediate recourse against GRAHAM COUNTY LAND COMPANY, and may, at FLEXIBLE FUNDING's option (i) require that GRAHAM COUNTY LAND COMPANY repurchase a *Purchased Receivable*, on demand, or (ii) require that GRAHAM COUNTY LAND COMPANY replace a *Purchased Receivable* with an *Eligible Receivable* with a net invoice amount no less than the net invoice amount of such *Purchased Receivable*, or (iii) charge to the *Reserve Account* the unpaid portion of such *Purchased Receivable*:

i. if such *Purchased Receivable* is not paid in full by the *Account Debtor* by the earlier of (i) the due date of the invoice relating to such *Purchased Receivable*, or (ii) ninety (90) days from the date of the invoice relating to such *Purchased Receivable*; or

ii. if such *Purchased Receivable* (or any portion thereof) is at the time of purchase by FLEXIBLE FUNDING, or thereafter becomes, a *Disputed Account*; or

iii. if GRAHAM COUNTY LAND COMPANY has breached any of its representations, warranties or covenants with respect to such *Purchased Receivable;* or

iv. it is discovered that such *Purchased Receivable* was not an *Eligible Receivable* when tendered to FLEXIBLE FUNDING for sale; or

v. when in FLEXIBLE FUNDING's reasonable credit judgment, the *Account Debtor* from whom the *Purchased Receivable* is owing has become insolvent; or

vi. upon the occurrence of an *Event of Default*, or upon the effective date of termination of this Agreement, in which case FLEXIBLE FUNDING may demand that GRAHAM COUNTY LAND COMPANY repurchase all *Purchased Receivables*.

The repurchase of a *Purchased Receivable* shall not constitute a reassignment thereof; FLEXIBLE FUNDING shall retain its security interest in such repurchased *Purchased Receivable* (a "*Repurchased Receivable*"); and at FLEXIBLE FUNDING's option (a) GRAHAM COUNTY LAND COMPANY shall immediately pay to FLEXIBLE FUNDING an amount equal to the full amount outstanding under the *Purchased Receivable* all fees, costs and expenses owing to FLEXIBLE FUNDING in connection therewith (collectively, the "*Repurchase Price*"), (b) charge the *Repurchase Price* to the *Reserve Account*, or (c) require GRAHAM COUNTY LAND COMPANY to replace such Repurchased Receivable with an *Eligible Receivable* with the same net invoice amount as the *Repurchased Receivable*. In the case of GRAHAM COUNTY LAND COMPANY's replacement of a *Repurchased Receivable* with an *Eligible Receivable* pursuant to the terms of this Section, FLEXIBLE FUNDING shall not be required to make any *Initial Purchase Payment* with respect to such replacement *Eligible Receivable* and FLEXIBLE FUNDING shall reassign to GRAHAM COUNTY LAND COMPANY the subject *Repurchased Receivable*.

14.   Fees Payable to FLEXIBLE FUNDING.

14.1   GRAHAM COUNTY LAND COMPANY agrees, in consideration for all *Advances* and other amounts paid by FLEXIBLE FUNDING under this Agreement, to pay to FLEXIBLE FUNDING a "*Factoring Fee*" on the outstanding principal amount of *Advances* until all amounts payable by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING under this Agreement are paid to FLEXIBLE FUNDING in cash, in full. The *Factoring Fee* shall, in the absence of an *Event of Default* (as defined in paragraph 27 below), mean a fluctuating rate that, when annualized, is equal to the greater of  (a) U.S. Prime Rate as quoted in the Wall Street Journal, Money Rates Section as the Prime Rate (the "*Prime Rate*"), **plus** nine and seventy-five hundredths percent (9.75%), or (b) fifteen and twenty-five one hundredths percent (15.25%) (the "*Ordinary Fee*"). Upon the occurrence of any *Event of Default*, the *Factoring Fee* shall mean the *Ordinary Fee* determined pursuant to the immediately preceding sentence **plus** five percent (5.00%) *per annum*. The *Factoring Fee* shall be computed on the basis of a year consisting of three hundred sixty (360) days for the number of days actually elapsed, and shall be payable monthly in arrears commencing on the first business of the calendar month immediately following the date of this Agreement, on the first business day of each calendar month thereafter, on the termination date of this Agreement, and following the termination date, upon demand by FLEXIBLE FUNDING until all amounts payable by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING under this Agreement are paid to FLEXIBLE FUNDING in cash, in full (each, a "*Fee Payment Date*"). For the purpose of computing the *Factoring Fee*, interest shall continue to accrue on the amount of any funds credited to the payment of the *Factoring Facility* for a period of five (5) business days after the date so credited.

14.2   In addition to the *Factoring Fee*, as compensation for FLEXIBLE FUNDING'S services provided for in this Agreement, GRAHAM COUNTY LAND COMPANY agrees to pay to FLEXIBLE FUNDING:

14.3   A "*Collateral Management Fee*" equal to one-tenth percent (0.10%) of the *Limit*, payable monthly in arrears on each *Fee Payment Date*.

14.4   An "*Unused Line Fee*" equal to the amount by which the *Factoring Fee* payable in any month is less than Fifteen Thousand and 00/100 Dollars ($15,000.00). The *Unused Line Fee* shall be calculated as of the end of each month and shall be payable on each *Fee Payment Date*. The *Unused Line Fee* shall be pro-rated for any partial month under this Agreement.

14.5   "*Liquidated Damages*" in amount equal to two percent (2.00%) of the *Limit* in the event that prior to the "*Initial Termination Date*", or prior to the last day of any "*Subsequent Renewal Period*" (as such terms are defined in paragraph 26 below), (a) GRAHAM COUNTY LAND COMPANY prepays all obligations payable to FLEXIBLE FUNDING pursuant to paragraph 32 below, or (b) pursuant to the terms of this Agreement, either (i) FLEXIBLE FUNDING demands repayment of the *Factoring Facility* and other amounts payable to FLEXIBLE FUNDING under the terms of this Agreement, in whole or in part, pursuant to paragraph 27 below, or (ii) repayment of the *Factoring Facility* and other amounts payable to FLEXIBLE FUNDING under the terms of this Agreement are otherwise accelerated in whole or in part pursuant to paragraph 27 below. GRAHAM COUNTY LAND COMPANY acknowledges and agrees that *Liquidated Damages* shall be payable in the amount described above notwithstanding any acceleration of repayment and/or the maturity date of the *Factoring Facility* pursuant to paragraph 27 below. FLEXIBLE FUNDING and GRAHAM COUNTY LAND COMPANY each hereby acknowledges and agrees that it would be impractical and extremely difficult to ascertain FLEXIBLE FUNDING's actual damages from early termination of the *Factoring Facility*, and that the *Liquidated Damages* has been arrived at by mutual agreement of FLEXIBLE FUNDING and GRAHAM COUNTY LAND COMPANY as to a reasonable calculation of FLEXIBLE FUNDING's lost profits as a result of early termination of the *Factoring Facility*. FLEXIBLE FUNDING and GRAHAM COUNTY LAND COMPANY each further hereby acknowledges and agrees that the *Liquidated Damages* provided above is intended to be fair and reasonable approximations of FLEXIBLE FUNDING's actual damages from early termination of the *Factoring Facility*, are presumed to be the amount of damages sustained by FLEXIBLE FUNDING as a result of such early termination, are reasonable under the circumstances currently existing, and that the *Liquidated Damages* are liquidated damages are not intended to be penalties.

15. GRAHAM COUNTY LAND COMPANY agrees that FLEXIBLE FUNDING may (a) charge all fees, costs and expenses payable by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING pursuant to the terms of this Agreement (including any amount paid by FLEXIBLE FUNDING and required to be reimbursed by GRAHAM COUNTY LAND COMPANY pursuant to the terms of this Agreement) to the *Factoring Facility*, (b) pay such amounts to FLEXIBLE FUNDING from the proceeds of the *Factoring Facility*, and (c) treat each such payment as an *Advance* of the *Factoring Facility* on the date proceeds of the *Factoring Facility* above are paid to FLEXIBLE FUNDING as described above.

### REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRAHAM COUNTY LAND COMPANY

16. GRAHAM COUNTY LAND COMPANY represents, warrants and covenants to FLEXIBLE FUNDING that (except insofar as GRAHAM COUNTY LAND COMPANY and FLEXIBLE FUNDING have expressly otherwise agreed in writing) that:

16.1 The goods and services provided by GRAHAM COUNTY LAND COMPANY to each *Account Debtor* that are described within each *Invoice Pack* were in fact provided or rendered on the date(s) and in the amount(s) described in the *Invoice Pack*, and that the *Eligible Receivables* evidenced thereby are and will continue to be genuine, bona fide and collectable and without right of offset, counterclaim or right of return or cancellation; and

16.2 Each *Account Receivable* that is submitted for funding and described in an *Invoice Pack* constitutes an *Eligible Receivable* (as defined in paragraph 1.4 above); and

16.3 GRAHAM COUNTY LAND COMPANY will immediately notify FLEXIBLE FUNDING, in writing if GRAHAM COUNTY LAND COMPANY is notified (in writing, by electronic communication or by telephone) by *Account Debtor* of any disputes, or of any right of offset, counterclaim or right of return or cancellation against *Account Debtor's* obligation to GRAHAM COUNTY LAND COMPANY; and

16.4 The *Collateral* is free and clear of all liens, encumbrances, security interests and adverse claims other than such as were created by this Agreement in favor of FLEXIBLE FUNDING; and

16.5 All *Accounts Receivable* in each *Invoice Pack* are, and at all times will continue to be, genuine, *bona fide* and collectible; and

16.6 No *Purchased Receivable* will, when assigned to FLEXIBLE FUNDING, or at any time thereafter, be a *Disputed Account* or subject to any dispute, right of offset, counterclaim, or right of cancellation; and

16.7 All *Purchased Receivables* will, when assigned to FLEXIBLE FUNDING, and at all times thereafter, be due and unconditionally payable on terms acceptable to FLEXIBLE FUNDING but never more than ninety (90) days from invoicing, and will conform to the terms expressly set forth on the face of the relevant invoice; no account will be past due at the time assigned; and

16.8 All facts, figures, representations given, or caused to be given by GRAHAM COUNTY LAND COMPANY to FLEXIBLE FUNDING in connection with the value of the *Purchased Receivables* assigned hereunder will be true and correct. FLEXIBLE FUNDING may verify GRAHAM COUNTY LAND COMPANY's *Account Debtor* contracts and balances; and

16.9 GRAHAM COUNTY LAND COMPANY's books and records do and will fully and accurately reflect all of GRAHAM COUNTY LAND COMPANY's assets and liabilities (absolute and contingent), have been and will be kept in the ordinary course of business in accordance with generally accepted accounting principles consistently applied and all information contained therein is and will be true and correct; and

16.10 All taxes of any governmental or taxing authority due or payable by, or imposed or assessed against, GRAHAM COUNTY LAND COMPANY, have been paid and will be paid in full before delinquency; and

16.11 There are no actions or proceedings pending by or against GRAHAM COUNTY LAND COMPANY before any court or administrative agency, and there are no pending, threatened, or imminent governmental investigations, or claims, complaints, or prosecutions involving GRAHAM COUNTY LAND COMPANY; and

16.12 GRAHAM COUNTY LAND COMPANY has the legal power and authority to enter into this Agreement and to perform and discharge GRAHAM COUNTY LAND COMPANY's obligations hereunder; and

16.13 No information furnished by or on behalf of GRAHAM COUNTY LAND COMPANY (including but not limited to facts, figures, and representations given) shall contain untrue statements of material fact or omit material facts.

17. Each warranty and representation contained in this agreement shall be deemed repeated with each Advance and shall be conclusively presumed to have been relied on by FLEXIBLE FUNDING regardless of any investigation made, or information possessed by FLEXIBLE FUNDING. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements contained in any other document or instrument which GRAHAM COUNTY LAND COMPANY shall give, or cause to be given, to FLEXIBLE FUNDING, either now or hereafter. FLEXIBLE FUNDING's right to bring an action for breach of any such representation or to exercise any right, remedy, power or privilege under this Agreement based upon the breach of any such representation shall survive the execution, delivery and

acceptance of this Agreement, and the closing of the transactions described in this Agreement, until all amounts payable to FLEXIBLE FUNDING under this Agreement are finally and indefeasibly paid to FLEXIBLE FUNDING in cash in full.

## GRANT OF SECURITY INTEREST; COLLATERAL

18.   GRAHAM COUNTY LAND COMPANY hereby pledges, assigns and grants to FLEXIBLE FUNDING a continuing lien upon and security interest in and to all of GRAHAM COUNTY LAND COMPANY's rights, title and interests in and to the following, wherever located and whether owned on the *Effective Date* or thereafter acquired, whether owned or held by GRAHAM COUNTY LAND COMPANY or by any other person in any manner for GRAHAM COUNTY LAND COMPANY's account (and specifically including all accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of all of the following), and as such terms are defined in the UCC (hereinafter the "*Collateral*"):

All cash, money, accessions, accounts, as-extracted collateral, certificates of title, chattel paper and all rights to payment in connection therewith, commercial tort claims, deposit accounts, documents, electronic chattel paper and all rights to payment in connection therewith, equipment, fixtures, general intangibles, goods, health-care-insurance receivables, instruments, inventory, investment property, letter-of-credit rights, payment intangibles, proceeds, records (including but not limited all to books and records pertaining to any of the items or subject matter described in this paragraph), software, supporting obligations, all rights to payment for money or funds advanced or sold, and all money or other property of any kind now or at any time or times hereafter in the possession or under the control of FLEXIBLE FUNDING or any affiliate of FLEXIBLE FUNDING or any representative, agent or correspondent of FLEXIBLE FUNDING pertaining to any of the items or subject matter described in this paragraph, and to the extent not otherwise included in the foregoing, all other property in which a Security Interest or other Lien may be granted under the UCC or which may be delivered to and held by FLEXIBLE FUNDING pursuant to the terms of this Agreement

19.   The pledge, assignment lien and security interest granted to FLEXIBLE FUNDING pursuant to this Agreement shall continue in full force and effect until all amounts payable to FLEXIBLE FUNDING pursuant to this Agreement have been finally and indefeasibly paid to FLEXIBLE FUNDING in cash and all other obligations of GRAHAM COUNTY LAND COMPANY hereunder have been performed in full, notwithstanding the termination of FLEXIBLE FUNDING's obligations to extend credit to GRAHAM COUNTY LAND COMPANY under this Agreement, the full or partial termination (whether by prepayment, demand or acceleration) of the *Factoring Facility*, in whole or in part, or that the *Factoring Facility* may from time to time be temporarily in a credit position. Any balances to the credit of GRAHAM COUNTY LAND COMPANY in the possession of FLEXIBLE FUNDING, and any other property or assets of GRAHAM COUNTY LAND COMPANY in the possession of FLEXIBLE FUNDING, shall be held by FLEXIBLE FUNDING as *Collateral*, and applied in whole or partial satisfaction of the amounts payable to FLEXIBLE FUNDING hereunder when due, subject to the terms of this Agreement. FLEXIBLE FUNDING shall not have any obligation to release any security interest, lien or other encumbrance in, on or to any *Collateral*, unless and until all of the requirements of paragraph 29 below have been fully satisfied and performed.  At all times prior to the final and indefeasible payment to FLEXIBLE FUNDING in cash of all amounts payable to FLEXIBLE FUNDING pursuant to the terms of this Agreement, FLEXIBLE FUNDING shall have, in addition to all other rights, powers, remedies and privileges of FLEXIBLE FUNDING under this Agreement (a) all rights, powers, remedies and privileges granted to a secured party under the UCC, and (b) all rights, powers, remedies and privileges with respect to *Collateral* granted to FLEXIBLE FUNDING under all other agreements, documents and instruments executed and/or delivered to FLEXIBLE FUNDING in connection with the transactions contemplated by this Agreement, and (c) all rights, powers, remedies and privileges of FLEXIBLE FUNDING with respect to the *Collateral* available under applicable law.

20.   GRAHAM COUNTY LAND COMPANY will execute and deliver to FLEXIBLE FUNDING security agreements, assignments (including, without limitation, assignments of specific accounts, *Accounts Receivable*, certificates of title, chattel paper, documents, instruments, goods, inventory, equipment and general intangibles), control agreements, mortgages, deeds of trust, collateral assignments, and other documents and instruments as FLEXIBLE FUNDING may at any time reasonably request to establish, evidence, attach, perfect, or protect any security interest, pledge, lien, charge, mortgage or other encumbrance granted to FLEXIBLE FUNDING.  GRAHAM COUNTY LAND COMPANY authorizes FLEXIBLE FUNDING to file all financing statements (including, without limitation, describing the Collateral as "all assets" or "all personal property," whether owned or hereafter acquired), and all continuations or amendments thereof, to establish, evidence attach, perfect or protect any security interest, pledge, lien, charge, mortgage or other encumbrance granted to FLEXIBLE FUNDING in the Collateral.

21.   GRAHAM COUNTY LAND COMPANY covenants and agrees that it shall not grant or give, or suffer to permit, any lien, Security Interest, pledge or other encumbrance in, on or to the Collateral, in whole or in part, without FLEXIBLE FUNDING's prior written consent, which consent will be granted or withheld in FLEXIBLE FUNDING's sole discretion.

22.   GRAHAM COUNTY LAND COMPANY hereby irrevocably appoints FLEXIBLE FUNDING its agent for the purpose of executing and filing any financing statement or similar document which may be necessary to perfect and continue perfected such security interest under the Uniform Commercial Code.  GRAHAM COUNTY LAND COMPANY hereby approves and ratifies any financing statement filed by FLEXIBLE FUNDING against GRAHAM COUNTY LAND COMPANY prior to the *Effective Date*.  GRAHAM COUNTY LAND COMPANY agrees to not further encumber the *Collateral* described herein.

23.   FLEXIBLE FUNDING may, in its sole discretion, decide to assist the efforts to require *Account Debtors* to pay *Accounts Receivable* obligations directly to the payment instructions outlined in paragraph 9 above, with the following actions: (i) notify any *Account Debtor* that its Account has been assigned to FLEXIBLE FUNDING by GRAHAM COUNTY LAND COMPANY and that payment thereof shall be made to the order of and directly to FLEXIBLE FUNDING and/or (ii) demand, collect or enforce payment of any *Accounts Receivable;* and/or (iii) communicate directly with GRAHAM COUNTY LAND COMPANY's Account Debtors to verify the amount and validity of any invoice created by GRAHAM COUNTY LAND COMPANY.

24.   GRAHAM COUNTY LAND COMPANY shall not, without FLEXIBLE FUNDING's prior written consent in each instance: (a) grant an extension of time for payment of any *Account Receivable*; (b) compromise or settle any *Account Receivable*; (c) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any *Account Receivable.*

25.   GRAHAM COUNTY LAND COMPANY hereby irrevocably appoints FLEXIBLE FUNDING and its designees GRAHAM COUNTY LAND COMPANY's true and lawful attorney in fact, to exercise after an *Event of Default*, all or any of the following powers until all amounts due FLEXIBLE FUNDING have been fully, finally, and indefeasibly paid in full:

25.1   Receive, take, endorse, assign, deliver, accept and deposit, in the name of FLEXIBLE FUNDING or GRAHAM COUNTY LAND COMPANY, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the *Accounts Receivable, Collateral* or the proceeds thereof;

25.2   Take or bring, in the name of FLEXIBLE FUNDING or GRAHAM COUNTY LAND COMPANY, all steps, actions, suits or proceedings deemed by FLEXIBLE FUNDING necessary or desirable to effect collection of or other realization upon the *Accounts Receivable* and/or other *Collateral.*

25.3   To extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all, or *Collateral* and discharge or release any *Account Debtor* or other obligor, without affecting any amounts due hereunder.

## TERM OF AGREEMENT

26.   Unless earlier terminated pursuant to the terms of this Agreement, this Agreement shall terminate on the 2nd anniversary of the *Effective Date* (the "*Initial Termination Date*"); provided however, this Agreement shall continue for additional 1-year periods commencing on the day immediately following the *Initial Termination Date*, and each subsequent 1-year period thereafter (each, a "*Subsequent Renewal Period*"), unless either party hereto provides written notice of its intent not to renew this Agreement at least sixty (60) calendar days prior to the *Initial Termination Date*, or sixty (60) calendar days prior to the end of a *Subsequent Renewal Period*, as applicable.

## TERMINATION BY FLEXIBLE FUNDING

27.   An event of default ("*Event of Default*") shall be deemed to have occurred if any of the following occurs:

27.1   GRAHAM COUNTY LAND COMPANY makes any false, misleading or untrue representation or warranty in connection with, or contained in, this Agreement, or fails to comply with any covenant, obligation or material provision of this Agreement; or

27.2   GRAHAM COUNTY LAND COMPANY makes a general assignment for the benefit of its creditors other than FLEXIBLE FUNDING or commences or has commenced against it any proceeding under any Title of the Bankruptcy Code of the United States or under any similar federal, state or local law existing for the relief from creditors; or

27.3   A Receiver or Trustee is appointed for GRAHAM COUNTY LAND COMPANY or any proceeding is instituted for the dissolution or full or partial liquidation of GRAHAM COUNTY LAND COMPANY; or

27.4   A sale or transfer of fifty percent (50%) or more of the interests of GRAHAM COUNTY LAND COMPANY is effected in one or a series of related transactions without the prior written approval of FLEXIBLE FUNDING, which approval shall not be unreasonably withheld; or

27.5   Any change occurs in GRAHAM COUNTY LAND COMPANY's business or business structure, including, without limitation, the ownership thereof, or financial condition, or disputes between principals/managers/officers, which causes FLEXIBLE FUNDING, in its sole discretion, to deem itself insecure; or

27.6   Any subordination agreement whereby any indebtedness of GRAHAM COUNTY LAND COMPANY to any third party is subordinated to GRAHAM COUNTY LAND COMPANY's obligations to FLEXIBLE FUNDING is amended without the consent of FLEXIBLE FUNDING or is breached or repudiated in any manner by a third party; or

27.7   GRAHAM COUNTY LAND COMPANY retains or converts moneys properly due to FLEXIBLE FUNDING; or

27.8   Any guarantor of GRAHAM COUNTY LAND COMPANY's obligations to FLEXIBLE FUNDING fails to perform or observe any of its obligations to FLEXIBLE FUNDING or notifies FLEXIBLE FUNDING of an intention to

DocuSign Envelope ID: B5EF5288-56CA-428B-AD07-DE9FF86D3498

rescind, modify, terminate or revoke any guaranty, or any such guaranty ceases to be in full force and effect for any reason whatsoever; or

27.9  A federal, state or local tax lien is filed against GRAHAM COUNTY LAND COMPANY or its principals; or

27.10  GRAHAM COUNTY LAND COMPANY fails to pay the full amount of all *Obligations* to FLEXIBLE FUNDING, in cash, upon the termination of this Agreement.

After an *Event of Default*, FLEXIBLE FUNDING may suspend or terminate FLEXIBLE FUNDING's obligations to make *Advances* and/or render other services hereunder upon notice to GRAHAM COUNTY LAND COMPANY that an *Event of Default* has occurred, in the event of a termination of this Agreement by FLEXIBLE FUNDING, GRAHAM COUNTY LAND COMPANY shall be obligated, without further demand, protest or notice of any kind, to pay immediately to FLEXIBLE FUNDING the full amount of all *Obligations* payable to FLEXIBLE FUNDING hereunder.  Notwithstanding the immediately preceding sentence, upon the occurrence of any *Event of Default* described in either of paragraphs 27.2 or 27.3 above, without notice, demand or other action by FLEXIBLE FUNDING (a) all amounts payable to FLEXIBLE FUNDING pursuant to this Agreement, including but not limited to, all outstanding and unpaid *Advances*, *Factoring Fees* payable thereon (until all amounts payable to FLEXIBLE FUNDING hereunder are paid in cash in full), *Liquidated Damages*, and all other fees, costs and expenses payable with respect thereto, shall immediately become due and payable whether or not payable on demand prior to such *Event of Default*, and (b) the *Factoring Fee* shall immediately increase to the default rate, and (c) all obligations to purchase *Eligible Receivables*, make *Advances* or otherwise provide any services or other accommodations to GRAHAM COUNTY LAND COMPANY under this Agreement, or any other agreement, document or instrument between the parties shall immediately terminate.  After the occurrence and during the continuation of any *Event of Default*, FLEXIBLE FUNDING may take all other and further actions and avail itself of any and all rights, powers, remedies and privileges available to FLEXIBLE FUNDING under this Agreement, under the UCC or other applicable law, at law or in equity.  Upon termination pursuant to this paragraph 27, FLEXIBLE FUNDING may take all steps deemed necessary to effect collection of the *Accounts Receivable* and otherwise dispose of the *Collateral* in accordance with the terms of this Agreement, the UCC and applicable law.

28.  In the absence of any *Event of Default*, FLEXIBLE FUNDING may terminate its obligations under this Agreement provided it has given written notice to GRAHAM COUNTY LAND COMPANY at least sixty (60) days prior to the effective date of termination, with all *Obligations* becoming immediately due and payable on the effective date of termination.

29.  This Agreement and the security interests hereby granted shall remain in effect until such time as all amounts payable to FLEXIBLE FUNDING under this Agreement have been paid to FLEXIBLE FUNDING in cash and satisfied in full, and a *General Release* shall have been executed and delivered by GRAHAM COUNTY LAND COMPANY in favor of FLEXIBLE FUNDING.

30.  After termination, at such time as all *Obligations* shall have been indefeasibly paid to FLEXIBLE FUNDING in cash and satisfied in full, and a *General Release* shall have been executed and delivered by GRAHAM COUNTY LAND COMPANY in favor of FLEXIBLE FUNDING, FLEXIBLE FUNDING will re-assign to GRAHAM COUNTY LAND COMPANY any and all interests it may have in the *Collateral* and will execute such termination statements as GRAHAM COUNTY LAND COMPANY may reasonably request.

### TERMINATION BY GRAHAM COUNTY LAND COMPANY

31.  In the event that:

31.1  FLEXIBLE FUNDING fails to pay to GRAHAM COUNTY LAND COMPANY when due any monies owing to GRAHAM COUNTY LAND COMPANY under this Agreement; or

31.2  FLEXIBLE FUNDING fails to perform timely the services to be rendered by FLEXIBLE FUNDING hereunder;

then, GRAHAM COUNTY LAND COMPANY may notify FLEXIBLE FUNDING of its intent to terminate this Agreement, which termination shall become effective only upon the payment to FLEXIBLE FUNDING of the full amount of all *Obligations* outstanding hereunder and all other fees, costs and expenses payable by GRAHAM COUNTY LAND COMPANY hereunder.

32.  GRAHAM COUNTY LAND COMPANY may terminate this Agreement at any time, for any reason, provided it has given written notice to FLEXIBLE FUNDING at least sixty (60) days prior to the effective date of termination and further provided that all *Obligations* payable hereunder shall have been paid in full to FLEXIBLE FUNDING prior to the effective date of termination, and a *General Release* shall have been executed and delivered by GRAHAM COUNTY LAND COMPANY in favor of FLEXIBLE FUNDING.  Any notice of termination which is not followed by payment in full within sixty (60) days shall be void and ineffective.

33.  Upon termination of this Agreement for any reason, FLEXIBLE FUNDING shall render an accounting for all *Purchased Receivables* to GRAHAM COUNTY LAND COMPANY.  Termination of this Agreement shall not relieve or discharge GRAHAM COUNTY LAND COMPANY from its payment obligations to FLEXIBLE FUNDING until such time as all payment obligations to FLEXIBLE FUNDING have been paid and satisfied in full.

DocuSign Envelope ID: B5EF5483-56CA-428B-AD67-DE9FF86D2400

## INSURANCE REQUIREMENTS

34.   GRAHAM COUNTY LAND COMPANY shall provide FLEXIBLE FUNDING with proof of employee bonding (if required by its' *Account Debtors*), workers compensation and liability insurance.  GRAHAM COUNTY LAND COMPANY shall notify FLEXIBLE FUNDING of any changes in insurance and shall ensure that FLEXIBLE FUNDING is named on the certificate of insurance list as certificate holder.

## INDEMNIFICATION

35.   GRAHAM COUNTY LAND COMPANY agrees and warrants that under no circumstances are employees of GRAHAM COUNTY LAND COMPANY to be considered employees of FLEXIBLE FUNDING for any purpose, including but not limited to, any state or federal wage and hour law, federal withholding, state withholding, withholding to other taxing authority or health benefits program; employees shall at all times be recognized as the employees of GRAHAM COUNTY LAND COMPANY for all purposes.  GRAHAM COUNTY LAND COMPANY shall promptly after each pay period as required, make payments to the Internal Revenue Service for federal taxes; to the State for state taxes; and to any other governmental agency to whom any tax or similar payment obligation is due with respect to employees' activities.  GRAHAM COUNTY LAND COMPANY shall cause FLEXIBLE FUNDING to be given promptly suitable evidence of all such payments.

36.   GRAHAM COUNTY LAND COMPANY warrants that all of its employees are legally entitled to be employed in the United States and agrees to defend and hold harmless FLEXIBLE FUNDING, its directors, officers, employees and agents, for any failure on the part of GRAHAM COUNTY LAND COMPANY to comply with relevant immigration, non-discrimination, employment and employee-benefit laws.

37.   Without limiting any other rights hereunder or under applicable law, GRAHAM COUNTY LAND COMPANY hereby agrees to indemnify FLEXIBLE FUNDING and all officers, directors, shareholders, employees and agents thereof (each an "*Indemnified Person*"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including attorneys' fees and disbursements (all of the foregoing being collectively referred to as "*Indemnified Amounts*") awarded against or incurred by any of them arising out of or relating to the transactions contemplated hereby or the ownership of any *Account Receivable*, including without limitation:  (a) any representation or warranty made by GRAHAM COUNTY LAND COMPANY or any officers or affiliates that was false or misleading when made; (b) GRAHAM COUNTY LAND COMPANY's breach of applicable law, rule or regulation; (c) any imperfection in FLEXIBLE FUNDING's security or ownership interest in any *Collateral* or *Account Receivable* caused by GRAHAM COUNTY LAND COMPANY; (d) any dispute, claim, offset or defense of any Obligor, including without limitation, any relating to the goods or services related to such *Accounts Receivable* and products liability claims; and (e) any tax, governmental fee or charge and all interest and penalties thereon.

38.   GRAHAM COUNTY LAND COMPANY hereby releases, discharges and agrees to hold harmless and indemnify FLEXIBLE FUNDING's banks from any and all actions, suits, causes of action, claims and demands whatsoever, including reasonable attorneys' fees and costs, which GRAHAM COUNTY LAND COMPANY has, or may have, in the future arising out of the authority GRAHAM COUNTY LAND COMPANY has granted to FLEXIBLE FUNDING to accept, endorse and deposit remittances for GRAHAM COUNTY LAND COMPANY to the FLEXIBLE FUNDING  Deposit Accounts.

## WAIVERS

39.   The failure of FLEXIBLE FUNDING or GRAHAM COUNTY LAND COMPANY to enforce any of the terms and provisions of this Agreement, or the failure to exercise any right upon a default hereunder shall apply only in the particular instance and shall not operate as a continuing waiver of rights.  To the maximum extent permitted under applicable law, GRAHAM COUNTY LAND COMPANY hereby irrevocably waives all of the following:

39.1   Any and all rights and remedies now or hereafter conferred by statute or otherwise which may require FLEXIBLE FUNDING to (a)  take any judicial proceedings in connection with any Collateral or otherwise use any Collateral in mitigation of FLEXIBLE FUNDING's damages as set forth herein, or (b) proceed against any person or entity liable for any obligations as a condition to or prior to proceeding hereunder; and (c) dispose, sell or otherwise realize upon or collect or apply any personal property, securing any obligations of GRAHAM COUNTY LAND COMPANY, as a condition to, or prior to proceeding against GRAHAM COUNTY LAND COMPANY hereunder.

## NOTICE

40.   Any notice, request or demand under this Agreement shall be in writing, with proof of receipt, issued via USPS, Fed Ex, UPS or designated email address.

40.1   Any Notice, Request or Demand shall be deemed received and effective on the day on which it is received.

40.2   Notice of any (a) change of address of principal place of business, (b) state of incorporation, (c) legal business name, or (d) Fictitious Business Name (DBA) by either party shall be in writing and mailed not less than ten (10) days prior to any such change.

DocuSign Envelope ID: B5EF5489-56CA-428B-ADB7-DE9FF86D3499

40.3   Both parties agree to communicate with one another fully and in good faith, particularly about business conditions, changes, concerns and or other matters pertaining to GRAHAM COUNTY LAND COMPANY's business, and each shall inform the other as soon as possible but not later than Five (5) days after any relevant occurrence.

## INSPECTION AND REPORTING

41.   FLEXIBLE FUNDING, through its agents or employees, shall have the right to inspect and audit the books and records of GRAHAM COUNTY LAND COMPANY at all reasonable times without hindrance or delay at FLEXIBLE FUNDING's expense.   GRAHAM COUNTY LAND COMPANY shall provide FLEXIBLE FUNDING with copies of its quarterly balance sheet, income statement and Employer's Quarterly Federal Tax Return, Form 941, by the 30th day following the end of each quarter.   FLEXIBLE FUNDING may monitor federal tax, state tax, and workers compensation insurance payments GRAHAM COUNTY LAND COMPANY is required to make.   GRAHAM COUNTY LAND COMPANY will provide proof of payment and copies of reports when requested.

42.   GRAHAM COUNTY LAND COMPANY shall have the right to inspect and audit the books and records of FLEXIBLE FUNDING pertaining to transactions subject to this Agreement upon default by FLEXIBLE FUNDING at GRAHAM COUNTY LAND COMPANY's expense.

## ASSIGNMENT

43.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors or permitted assigns, and may be assigned by FLEXIBLE FUNDING in whole or in part, but shall not be assignable by GRAHAM COUNTY LAND COMPANY without the express, written consent of FLEXIBLE FUNDING.

44.   Any attempted assignment by GRAHAM COUNTY LAND COMPANY of its rights or obligations under this Agreement without the express prior written consent of FLEXIBLE FUNDING shall be void, and any permitted assignment will not excuse GRAHAM COUNTY LAND COMPANY's obligations to FLEXIBLE FUNDING without a full release of such obligations and duties, signed by both parties.   FLEXIBLE FUNDING may still proceed against GRAHAM COUNTY LAND COMPANY on any payment obligation outstanding at the time of assignment until such obligation is indefeasibly fulfilled by GRAHAM COUNTY LAND COMPANY or its assigns.

45.   The parties anticipate that FLEXIBLE FUNDING may assign its rights in the *Collateral* provided under this Agreement and monies receivable by it hereunder to its lender(s).   GRAHAM COUNTY LAND COMPANY agrees to such assignment and that any such assignee shall be a third-party beneficiary of this Agreement.

## SEVERABILITY OF PROVISIONS

46.   Each and every provision of this Agreement shall be severable from every other provision for the purposes of determining legal enforceability of any such provision or provisions.

## DISPUTE RESOLUTION AND JUDICIAL ACTIONS

47.   Any dispute between FLEXIBLE FUNDING and GRAHAM COUNTY LAND COMPANY arising out of or in connection with this Agreement shall, upon written demand, be determined by binding arbitration in San Francisco, California. The losing party shall pay to the prevailing party any and all legal expenses and reasonable attorneys' fees incurred by the prevailing party in enforcing this Agreement.

48.   In the event that one or more party waive or decline to participate in Binding Arbitration, any action shall be filed in the Superior Court or District Court located in San Francisco, California.

49.   GRAHAM COUNTY LAND COMPANY agrees to reimburse FLEXIBLE FUNDING, on demand, for:

49.1   The actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which GRAHAM COUNTY LAND COMPANY is a party and FLEXIBLE FUNDING is not;

49.2   Upon a finding that FLEXIBLE FUNDING is the prevailing party, the actual amount of all costs and expenses, including attorneys' fees and costs, which FLEXIBLE FUNDING may incur in enforcing this Agreement; and

49.3   Any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against GRAHAM COUNTY LAND COMPANY, including those (a) arising out the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of GRAHAM COUNTY LAND COMPANY's plan thereunder.

50.   IN THE EVENT THAT ONE OR MORE PARTIES HERETO DECLINES BINDING ARBITRATION, GRAHAM COUNTY LAND COMPANY AND FLEXIBLE FUNDING EACH HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING HERETO, ANY DOCUMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED

DocuSign Envelope ID: B5EF5489-56CA-42A8-ADD7-DE9FF86D2499

HEREBY OR THEREBY. GRAHAM COUNTY LAND COMPANY AND FLEXIBLE FUNDING ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO FLEXIBLE FUNDING TO ENTER HEREINTO. <u>EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.</u> EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

51.   This agreement shall be deemed to have been made in the State of California and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and constructed in accordance with the laws of the State of California, without regard to principles of conflicts of law.

## AUTHORITY AND EFFECTIVENESS

52.   GRAHAM COUNTY LAND COMPANY, INC. is a duly authorized and existing entity in good standing under the laws of the **State of North Carolina**. The execution, delivery and performance of this Agreement and the documents contemplated herein are within GRAHAM COUNTY LAND COMPANY's powers, have been duly authorized, and are not in contravention of any law, the terms of any indenture, agreement or undertaking to which GRAHAM COUNTY LAND COMPANY is a party or by which it is bound.

53.   GRAHAM COUNTY LAND COMPANY hereby authorizes, and FLEXIBLE FUNDING hereby agrees to accept, instructions from any personnel issued a login to the FLEXIBLE FUNDING portal.

54.   This Agreement will remain in full force and effect and continue to be effective should: (a) any petition be filed by or against GRAHAM COUNTY LAND COMPANY for liquidation or reorganization; (b) GRAHAM COUNTY LAND COMPANY become insolvent or make an assignment for the benefit of creditors; or (c) a receiver or trustee be appointed for all or any significant part of GRAHAM COUNTY LAND COMPANY's assets.

## FLEXIBILITY AND INTREGRATION

55.   FLEXIBLE FUNDING's rights and remedies under this Agreement shall be cumulative and FLEXIBLE FUNDING shall have all other rights and remedies not inconsistent therewith as provided by law.  No exercise by FLEXIBLE FUNDING of one right or remedy shall be deemed an election and no waiver by FLEXIBLE FUNDING of any default on GRAHAM COUNTY LAND COMPANY's part shall be deemed a continuing waiver.  No delay by FLEXIBLE FUNDING shall constitute a waiver or election.

56.   This Agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof.

## GENERAL PROVISIONS

57.   This Agreement amends and restates its entirety, and is given in replacement of and in substitution for, but not in repayment of, the *Original Factoring Agreement* between *FirstLine* and GRAHAM COUNTY LAND COMPANY, as assigned to, and assumed by, FLEXIBLE FUNDING pursuant to the *Assignment Documents*.

58.   FLEXIBLE FUNDING's rights, powers, remedies and privileges under this Agreement (specifically including all rights, powers, remedies and privileges of FLEXIBLE FUNDING as a Secured Party under the UCC) shall be cumulative and not alternative or exclusive, irrespective of any other rights, powers, remedies or privileges that may be available to FLEXIBLE FUNDING under any other agreement, document or instrument between the parties, by operation of law or otherwise, and may be exercised by FLEXIBLE FUNDING at such time or times and in such order as FLEXIBLE FUNDING in FLEXIBLE FUNDING's sole discretion may determine, and are for the sole benefit of FLEXIBLE FUNDING.

59.   FLEXIBLE FUNDING's rights, powers, remedies and privileges under this Agreement and the agreements, covenants, liabilities and obligations of Borrower set forth in this Agreement (including, but not limited to, the final and indefeasible payment to FLEXIBLE FUNDING in cash of all amounts payable to FLEXIBLE FUNDING under this Agreement in full, and all security interests, liens, charges and other encumbrances granted to FLEXIBLE FUNDING under this Agreement) shall continue to be effective, or be reinstated, as the case may be, if at any time (a) any payment in respect of the *Factoring Facility* or other amount payable to FLEXIBLE FUNDING hereunder or performance hereunder is rescinded or must otherwise be restored or returned by FLEXIBLE FUNDING by reason of any bankruptcy, reorganization, arrangement, composition or similar proceeding, whether as a "voidable preference", "fraudulent conveyance", or otherwise, or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, GRAHAM COUNTY LAND COMPANY or any other person, or any property of GRAHAM COUNTY LAND COMPANY or any other person, or otherwise, all as though such payment had not been made or performance completed.

60.   In no event will FLEXIBLE FUNDING have any liability to GRAHAM COUNTY LAND COMPANY for lost profits or other special or consequential damages.

DocuSign Envelope ID: B5EF5293-56CA-42A8-AD07-DE0FF89D2480

61.   GRAHAM COUNTY LAND COMPANY acknowledges that FLEXIBLE FUNDING does not intend to reserve, charge or collect interest on money borrowed under this Agreement at any rate in excess of the rates permitted by applicable law and that, should a final order determine that any interest rate provided for in this Agreement exceeds such legally permissible rate(s), such rate will automatically be reduced to the maximum rate permitted under applicable law.  If FLEXIBLE FUNDING should collect any amount from GRAHAM COUNTY LAND COMPANY which is determined to be interest in a final order, and such amount would result in the interest rate charged hereunder exceeding the maximum rate permitted by applicable law, such amount will be applied to reduce principal of the *Factoring Facility* or, if no amounts payable to FLEXIBLE FUNDING pursuant to this Agreement remain outstanding, will be refunded to GRAHAM COUNTY LAND COMPANY.

62.   This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement effective July 22, 2019.

*for* FLEXIBLE FUNDING LTD. LIABILITY CO.

Steve Capper — 67BF06D783444E3...

Paul DeLuca — C7C5070615CE405...

*for* GRAHAM COUNTY LAND COMPANY, L.L.C.

Name: Randy Jordan — 4F5437AEE440...

Title: Member